UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MH PILLARS LTD, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CAROL REALINI, et al.,<br><br>Defendants. | Case No. 15-cv-1383-PJH<br><br>**ORDER DENYING MOTION TO DISQUALIFY DEFENDANTS' COUNSEL** |

The motion of plaintiffs MH Pillars Ltd. (MHP-UK) and MH Pillars Inc. ("MHP-USA") for an order disqualifying the law firm of Bryan Cave LLP ("Bryan Cave") from representing defendants Carol Realini ("Realini"), Rodney Robinson ("Robinson"), Christopher Martin ("Martin"), and Ultralight FS Inc. f/k/a Obopay ("Obopay") in the present action came on for hearing before this court on June 14, 2017. Plaintiffs appeared by their counsel Peter Fredman; defendants Realini, Robinson, Martin, and Obopay appeared by their counsel K. Lee Marshall and Alexandra C. Whitworth; and defendant Accelerated Commerce Solutions, Inc. ("ACS") appeared by its counsel Patricia A. Welch and Christopher G. Karagheuzoff. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby DENIES the motion as follows.

## BACKGROUND

This case arises out of a series of transactions in early 2013 involving several written agreements. Plaintiffs refer to these agreements collectively as "the "Obopay transaction." Plaintiff MHP-UK is a UK corporation that operates an Internet-based

provider of payment services called "Payza."  Plaintiff MHP-USA is a New York corporation that is a wholly-owned subsidiary of MHP-UK.  Plaintiffs (collectively, "MHP") assert that they paid $1.65 million for a minority ownership interest in Obopay (also an Internet-based payment platform), including its state money-transmittal license or "MTL" rights, with an option to purchase the rest of Obopay from Realini.

As alleged in the first amended complaint ("FAC"), MHP-USA entered into an "Agent Agreement" with Obopay on March 28, 2012, pursuant to which Obopay agreed to appoint MHP-USA as its agent and authorized delegate with respect to Obopay's MTL rights, and to provide MHP-USA with certain "regulatory compliance services" in support of MHP-USA's performance of money transfer services in those states where Obopay maintained licenses.  FAC ¶¶ 19, 21 & Exh. B.  MHP-USA allegedly paid Obopay an up-front $100,000 "on-boarding fee" plus $6,500 per month for the first year.  FAC ¶ 23.  On November 9, 2012, Obopay was sold inclusive of its MTL assets to an overseas buyer, nonparty OBP Investments, Inc. ("OBP").  FAC ¶¶ 26-29.

Plaintiffs assert that Robinson – the "sole agent/employee" of ACS – had approached MHP and its principals, Firoz Patel and Ferhan Patel, with regard to a potential purchase of the Obopay MTL assets from ACS (which would acquire them from OBP), and subsequently submitted an initial written proposal to sell the MTL assets to MHP.  FAC ¶¶ 30-33.  On December 20, 2012, ACS entered into a "Professional Services Agreement" with MHP-USA, "to perform due diligence services that may or may not result in a subsequent agreement" between Obopay and MHP-USA.   FAC ¶ 36 & Exh. E.  The Agreement obligated ACS to perform certain services listed in the agreement, and required MHP-USA to pay ACS for fees related to the preparation of certain "Legal Documents."  FAC Exh. E at 6-7.

OBP took steps to close down U.S. operations effective December 31, 2012.  FAC ¶ 29.  On January 30, 2013, OBP sold all shares of Obopay – now stripped of all non-MTL-related assets – to Realini in exchange for an assumption of certain U.S. liabilities.  FAC ¶ 37.  On January 31, 2013, the "new" Realini-owned Obopay sold MHP-UK 9% of

its preferred stock for $1,250,000 pursuant to the "Stock Purchase Agreement;" and on February 4, 2013, Obopay and Realini entered into an "Option Agreement" that sold MHP-UK a $400,000 option to acquire the remaining 91% of stock in Obopay. FAC ¶ 37 & Exhs. F, G.

On March 28, 2013, defendants advised that the existing Obopay agency program was "non-compliant" and that Obopay "needed custody and control of an amount equal to U.S. client fund in Obopay/Payza customer accounts for MTL compliance purposes[.]" FAC ¶ 52. Plaintiffs claim, however, that defendants did not intend to resolve any compliance issues, and failed to disclose that they had initiated hostile action against plaintiffs, including reporting them to the Department of Homeland Security for alleged criminal activity. FAC ¶ 53. They assert that on April 10, 2013, "in reliance on these representations and non-disclosures," MHP-USA transferred $4 million to Obopay, representing all the Obopay/Payza customer funds plus a $100,000 buffer. FAC ¶ 54.

On June 3, 2013, Realini, on behalf of Obopay, sent MHP a letter suspending "all Obopay services and Payza's agency appointment, "in order to avoid a violation of legal requirements, or to investigate or respond to reasonably suspected fraudulent activity[,]" and also providing notice of the termination of the Agent Agreement and the rescinding of the Option Agreement. FAC ¶ 55 & Exh. K. Plaintiffs claim that Realini and Obopay never offered to return the consideration paid for the Option Agreement, nor the funds that MHP-UK was supposed to recover upon exercise of the option. FAC ¶ 56. In addition, they allege, Realini and Obopay refused to pay MHP-UK the redemption price for the stock shares, and never returned or offered to return the $4 million in Obopay/Payza customer funds. FAC ¶¶ 57-58.

Plaintiffs filed the present action on March 25, 2015, asserting claims of breach of fiduciary duty, negligence, breach of contract, fraud, rescission/restitution, and violation of California Business & Professions Code § 17200. The United States filed a motion to intervene, and successfully sought a stay pending resolution of a (sealed) criminal investigation. The stay was eventually lifted in August 2016, at which point defendants

1 filed motions to dismiss and a motion to compel plaintiffs to post a bond. The court
2 granted the motions to dismiss, with leave to amend, and denied the motion for a bond.
3 Plaintiffs filed the FAC on March 30, 2017.

**DISCUSSION**

A. Legal Standard

A motion to disqualify counsel brings the client's right to the attorney of his or her choice into conflict with the need to maintain ethical standards of professional responsibility. See Jessen v. Hartford Cas. Ins. Co., 111 Cal. App. 4th 698, 705 (2003) (citations omitted). Although disqualification is within the sound discretion of the trial court, it is considered a "drastic measure" and is thus imposed only when absolutely necessary. See Visa U.S.A., Inc. v. First Data Corp., 241 F.Supp. 2d 1100, 1103-04 (N.D. Cal. 2003) (citations omitted). Moreover, because disqualification motions may be misused for tactical reasons, they "should be subjected to particular judicial scrutiny." Shurance v. Planning Control Int'l, Inc., 839 F.2d 1347, 1349 (9th Cir. 1985) (citation and quotation omitted).

Because federal courts apply state law in determining matters of disqualification, they are required to follow the reasoned view of the state supreme court when it has spoken on the issue. In re Cnty. of L.A., 223 F.3d 990, 995 (9th Cir. 2000), quoted in Reading Int'l, Inc. v. Malulani Group, Ltd., 814 F.3d 1046, 1049 (9th Cir. 2016). Under California law, a trial court's authority to disqualify an attorney derives from the court's inherent power to "control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." Cal. Civ. P. Code § 128(a)(5).

Under the California Rules of Professional Conduct, an attorney must avoid the representation of adverse interests, and cannot, "without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." Cal. R. Prof. Conduct,

4

1  Rule 3-310(E). Rule 3-310(E) is generally invoked where the attorney successively
2  represents clients with potential or actual adverse interests, and where the attorney
3  simultaneously represents clients with potential or actual adverse interests. See Jessen,
4  111 Cal. App. 4th at 705 (citing Flatt v. Sup. Court, 9 Cal. 4th 275, 283-84 (1994)).

Where, as here, the dispute arises from alleged successive representation, the governing test requires that "the client demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations" in order to obtain the disqualification of the target attorney. Flatt, 9 Cal. 4th at 283. By contrast, when the facts involve simultaneous representation, the rule of disqualification, "in all but a few instances, . . . is a per se or 'automatic' one." Id. at 284.

The "substantial relationship" test requires that the former client show that "the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client." River W., Inc. v. Nickel, 188 Cal. App. 3d 1297, 1302 (1987). If the former client succeeds in doing so, the court "will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation" and it "will not inquire into their nature and extent." Id. at 1303.

B.  Plaintiffs' Motion

Plaintiffs argue that Bryan Cave should be disqualified from representing Realini, Robinson, Martin, and Obopay in this litigation because starting on December 26, 2012, Bryan Cave served as "joint legal counsel" for MHP, ACS, and Robinson, with regard to the regulatory licensing and "change of control" compliance issues that plaintiffs argue were central to the transaction involving the purchase of Obopay and its state MTL rights.

Plaintiffs contend that the Obopay "transaction" originated in December 2012 when Robinson approached MHP about purchasing Obopay's MTL assets from ACS. Ferhan Patel contends that Robinson was the "sole employee-operator" of ACS at that time, and that under his initial proposal, ACS would buy Obopay (including its MTL assets

1    only) and then sell it to MHP after performing the necessary regulatory and change-of-
2    control compliance services. Declaration of Ferhan Patel ("Ferhan Decl.") ¶¶ 5-6. He
3    asserts that on December 15, 2012, Robinson/ACS emailed plaintiffs an initial written
4    proposal, in which Robinson represented that "we can pick up the licenses" and laid out a
5    plan for doing so. Ferhan Decl. ¶ 7 & Exh. 1; see also FAC ¶ 33 & Exh. D.

   Robinson had previously been in discussions with Bryan Cave regarding the possibility of ACS retaining the firm to provide advice in connection with the acquisition. Declaration of Judith Rinearson in opposition to plaintiffs' motion ("Rinearson Decl.") ¶ 4; Declaration of Rodney Robinson in opposition to plaintiffs' motion ("Robinson Decl.") ¶¶ 3-4. Bryan Cave sent Robinson (at ACS) a letter re "terms of engagement" dated December 19, 2012. See Ferhan Decl. Exh. 4; see also Rinearson Decl. ¶¶ 5, 7 & Exh. B; Robinson Decl. ¶ 4. The letter, signed by Rinearson (a Bryan Cave partner based in its New York office), stated, "We are pleased that you have chosen to engage Bryan Cave LLP to provide legal services to you in connection with the acquisition of Obopay and related regulatory compliance and contractual assistance and such further matters that we mutually agree to undertake." Id.

   On December 20, 2012, MHP-USA and ACS entered into the "Professional Services Agreement," pursuant to which MHP-USA agreed to pay the "legal costs of further developing and implementing the proposal." Ferhan Decl. ¶ 8 & Exh. 2; see also FAC ¶ 36 & Exh. E. This Agreement provided that "ACS will be performing due diligence between 12/19/2012 and 12/31/2012 concerning the purchase of Obopay, Inc., and the subsequent sale of Obopay, Inc. to [MHP-USA], together the "Transaction[;]" that it "is for [MHP-USA] to reimburse ACS for 3rd party expenses related to the Transaction[;]" and that "ACS will invoice [MHP-USA] for legal fees related to the Legal Documents [defined in Agreement] on an actual basis with invoices or fee documentation from 3rd party legal entities attached." Ferhan Decl. Exh. 2; FAC Exh. E.

   Also on December 20, 2012, according to Ferhan Patel, Robinson sent MHP-USA a "terms sheet" (draft summary of the terms of the pending ACS-Obopay transaction),

1  and asked plaintiffs to send Bryan Cave a $15,000 retainer because he needed to send
2  the terms sheet to "Judith [Rinearson, at Bryan Cave] tonight" to see if it worked "from a
3  change of control stand point." Ferhan Decl. ¶ 9 & Exh. 3. Plaintiffs assert that on
4  December 21, 2012, MHP-USA paid Bryan Cave the $15,000 retainer referenced in the
5  Bryan Cave-ACS engagement letter. Ferhan Decl. ¶ 10 & Exh. 4; Rinearson Decl. ¶¶ 5,
6  7 & Exh. B.

On December 21, 2012, Robinson sent Ferhan Patel a draft "change of control" notice on Rinearson's Bryan Cave letterhead. Robinson indicated that it was "a letter that we will be sending to all the states on change of control notice for you." Ferhan Decl. ¶ 11 & Exh. 5. Ferhan Patel asserts that on December 24, 2012, he participated in a 30-minute conference call with Rinearson and Robinson to discuss the "proposed deal structure and change of control regulatory issues." Ferhan Decl. ¶ 12.

On December 26, 2012, Ferhan Patel wrote Rinearson in an email (copied to Robinson) that he was "trying to minimize redundant legal fees[.]" He proposed that "[a]s ACS and MH Pillars are in this deal together, and need to make it work together, it makes sense" for Bryan Cave to jointly represent MHP and ACS in connection with the Obopay transaction. Ferhan Decl. ¶ 13 & Exh. 7. Rinearson initially indicated that the joint representation would be "doable," with a "special form of conflict waiver," and stated that she would "get a copy and circulate it to you both" (referring to Ferhan Patel and Robinson). Ferhan Decl. ¶ 14 & Exh. 7.

However, later in the evening on that same date, she advised Ferhan Patel and Robinson that she "may have spoken too soon" and that her colleagues were "uncertain that we [Bryan Cave] can represent both ACS and MH Pillars in the sale transaction between ACS and MH Pillars[;]" she added, however, that "[i]t appears we can provide regulatory advice for both parties on licensing and the change of control issues," and that she would "follow up on this." Ferhan Decl. ¶ 15 & Exh. 8.

In their motion, plaintiffs argue that an attorney-client relationship was formed at that point between MHP and Bryan Cave, because MHP requested joint representation to

7

save money on legal fees, and "in response, Rinearson agreed to provide joint regulatory advice." They claim that she "provided substantial legal advice on multiple occasions in confidential settings with full knowledge that MHP was relying on that advice and paying its legal fees."

The parties initially contemplated a sale transaction between MHP and ACS, but the deal was subsequently restructured, so no sale between ACS and MHP ever occurred. Ferhan Decl. ¶ 16; Robinson Decl. ¶ 8. Instead, according to Ferhan Patel, ACS took the role of "deal broker" and the role of managing Obopay post-transaction "for MHP's benefit." Ferhan Decl. ¶ 16. He claims that Bryan Cave provided "regulatory" advice for "both parties" (ACS and MHP) during December 2012 and into January 2013. Ferhan Decl. ¶¶ 17-21 & Exh. 9.

On Tuesday, January 1, 2013, Ferhan Patel engaged in further email discussions with Rinearson, Robinson, and Firoz Patel, regarding "how to structure the transaction with respect to licensing and change of control issues." Ferhan Decl. ¶ 20 & Exh. 9. Ferhan Patel contends that plaintiffs "agreed to the ultimate Obopay transition structure" based on advice by Rinearson, who recommended that they use Realini to hold the shares during the transitional period because Realini had previously controlled Obopay and using her would help "avoid change of control issues." Ferhan Decl. ¶¶ 21-22. He contends that Bryan Cave represented MHP, ACS, and Robinson with respect to "the regulatory compliance aspects of the Obopay transaction," which he claims plaintiffs understood to be "designed to implement the compliance structure that Ms. Rinearson had devised." Ferhan Decl. ¶ 23 & Exh. 10 (Jan. 10, 2013, email from Bryan Cave attorney Lou Spelios). He asserts that plaintiffs paid Bryan Cave $30,000 for that regulatory and change-of-control advice, and separately paid about $15,000 to Obopay and Realini's attorney, who drafted the transactional documents. Ferhan Decl. ¶ 24.

Ferhan Patel contends that after completion of the Obopay "transaction," Bryan Cave extended its representation to include Obopay with respect to the same subject matter because ACS was "managing" Obopay and MHP began paying all its operational

8

expenses. See Ferhan Decl. ¶ 25. He claims that until June 2013, plaintiffs "understood" that Rinearson and Bryan Cave represented all MHP, ACS, and Robinson with respect to any licensing and change of control issues that might (and did) arise in connection with "the structure Ms. Rinearson had devised for the Obopay transaction." Ferhan Decl. ¶ 26. In addition, he asserts, they "understood" that Bryan Cave would continue to provide that representation "to all parties" during the second phase, where actual ownership of Obopay was scheduled to be transferred to MHP-UK, and that Rinearson would continue to provide "change of control" advice to all parties. Id.

On June 3, 2013, when Realini rescinded the Option Agreement and provided notice of the termination of the Agent Agreement, she copied Rinearson (at Bryan Cave) on the letter. Ferhan Decl. ¶ 28 & Exh. 13. Thereafter, according to Ferhan Patel, Rinearson "began holding herself and Bryan Cave out as representatives of the defendants in opposition to MHP in connection with dispute." Ferhan Decl. ¶ 28.

Plaintiffs acknowledge the general applicability of the "substantial relationship" test, but argue that because the prior representation involved "joint clients" and the subsequent action relates to the same matter, the "substantial relationship" test adds nothing to the disqualification analysis. They claim this is because a "substantial relationship" between the former representation and the subsequent action is "inherent" in such a situation. In support, they cite Zador Corp. v. Kwan, 31 Cal. App. 4th 1285 (1995), a case that primarily addresses the issue of informed waivers of potential future conflicts.

Plaintiffs assert that Bryan Cave is automatically disqualified from representing defendants because Rinearson and Bryan Cave represented MHP with respect to "the very subject matter at issue in this litigation, and did not obtain its consent . . . to take an adverse position against it in the event a conflict arose." They claim that the joint representation of MHP and ACS arose "within days" of Bryan Cave's initial retention (by ACS), and the subsequent representation of the other defendants (Realini, Robinson, Martin) "flowed subsequently from that joint representation." Thus, plaintiffs contend,

9

1  Rinearson and Bryan Cave had an ethical obligation to step away from the matter if and
2  when "adversity developed between any of their clients with respect to these matters."

3  Plaintiffs contend that Bryan Cave's decision to take the side of some of the jointly-
4  represented clients against the others is a breach of the duty of loyalty that automatically
5  disqualifies it from representing defendants in this matter. They assert that it is irrelevant
6  that Rinearson is no longer at Bryan Cave, as the entire firm was immediately disqualified
7  from representing anyone against MHP with respect to "this subject matter" from the
8  moment the conflict arose.

9  In opposition, defendants argue that plaintiffs' motion should be denied because
10 no attorney-client relationship existed between plaintiffs and Bryan Cave; because
11 confidentiality is not an issue; and because the duty of loyalty also does not require
12 disqualification.

13 First, defendants contend that plaintiffs never engaged Bryan Cave or Rinearson,
14 and that indeed, during the course of Rinearson's representation of ACS, she refused to
15 agree to represent "both sides" of the transaction and told plaintiffs they needed their own
16 counsel. Defendants argue that the mere suggestion by Rinearson that Bryan Cave
17 could perhaps handle the "change of control issues" after the transaction was complete
18 did not create an attorney-client relationship between plaintiffs and Bryan Cave, as no
19 contract (express or implied) was ever formed and Rinearson's suggestion was never
20 accepted by plaintiffs or acted upon by Rinearson.

21 Defendants contend that the fact that Rinearson included the Patels in some
22 conference calls during which Rinearson provided legal advice to ACS, and the fact that
23 plaintiffs (or the Patels) were copied on some emails that Rinearson sent to ACS, do not
24 establish the existence of an attorney-client relationship. They concede that ACS'
25 decision to allow MHP-USA to participate in those phone calls and emails may have
26 waived any privilege regarding the subjects of those calls and emails, but claim it cannot
27 be construed as an agreement that Bryan Cave would represent MHP in connection with
28 the Obopay transaction. They also assert that plaintiffs' agreement to pay ACS' legal

10

1 fees did not constitute an agreement with Bryan Cave for legal representation.

2 Defendants contend that Rinearson and Bryan Cave represented only ACS, and that after mid-January 2013, when plaintiffs decided they wanted to structure the deal directly, rather than going through ACS, Bryan Cave had no further involvement in the transaction or in the drafting of the documents/agreements that comprised the sale/option. They assert that Rinearson and Bryan Cave did provide regulatory advice to Obopay after the transaction was completed, but that that was a separate matter, unrelated to the option/stock purchase transaction in which Bryan Cave had initially represented ACS.

Defendants also argue that disqualification is not justified because confidentiality is not an issue in this case. Thus, they contend, not only are plaintiffs not former clients, they are not former clients about whom Rinearson obtained any material confidential information. Defendants concede that courts sometimes presume that confidential information has been disclosed to the attorney if the matters are "substantially related," but that the substantial relationship test is not applicable where there "is no realistic chance that confidences were disclosed." See Goldberg v. Warner/Chappell Music Inc., 125 Cal. App. 4th 752, 760 (2005). Consequently, they assert, courts focus less on the meaning of the words "substantial" and "relationship" and look instead at the practical consequences of the attorney's representation of the former client. See id. The real question, they argue, is whether there is a genuine likelihood that allowing the attorney to remain on the case will affect the outcome of the proceedings before the court. See Kirk v. First Am. Title Ins. Co., 183 Cal. App. 4th 776, 792 (2010).

Here, defendants assert, the evidence submitted demonstrates that there is no prophylactic purpose to plaintiffs' motion to disqualify Bryan Cave, because Rinearson no longer works at the law firm. They also contend that even if plaintiffs provided Rinearson with confidential information (of which there is no evidence), the evidence presented shows that such information was also shared with Robinson. They assert that plaintiffs never had any communication with Rinearson where Robinson was not also present, and

that there are no emails between Rinearson and plaintiffs (and/or the Patels) on which Robinson is not copied.

Finally, defendants argue that they themselves will be substantially prejudiced if Bryan Cave is disqualified. They are paying their legal fees largely out of their own pockets, and believe that the cost of hiring new counsel and getting them up to speed would be enormous. Realini states in her declaration that "[o]ver the past two years, we [referring to herself, Robinson, and Martin] have already incurred $341,159.97 in connection with Bryan Cave's services," adding that "[w]e are paying most of these fees out of our own personal funds." Realini Decl. ¶ 3. The individual defendants have also spent considerable time providing crucial background information to Bryan Cave's lawyers. Realini asserts that "[f]inding new counsel now would be a huge burden and getting them to the point where they know as much about the litigation as Bryan Cave's team would be even more challenging." Id.

The court finds that the motion must be DENIED. Plaintiffs have not established the existence of an attorney-client relationship between themselves and Bryan Cave during the relevant period. Before an attorney may be disqualified from representing a party in litigation because his representation of that party is adverse to the interest of a current or former client, it must first be established that the party seeking the attorney's disqualification was or is "represented" by the attorney in a manner giving rise to an attorney-client relationship. Koo v. Rubio's Restaurants, Inc., 109 Cal. App. 4th 719, 729 (2003) (citation omitted).

The burden is on the party seeking disqualification to establish the attorney-client relationship. Id. (citation omitted). However, an attorney-client relationship is not created by the unilateral declaration of one party to the relationship, but rather can be created only by contract, express or implied. Id.; see also Fox v. Pollack, 181 Cal. App. 3d 954, 979 (1986). Both express and implied contracts are based on the expressed or apparent intent of the parties; with an implied contract, that intent is manifested by conduct. See Responsible Citizens v. Superior Court, 16 Cal. App. 4th 1717, 1732-33 (1993).

12

Here, it is undisputed that there was no express contract. Plaintiffs do not provide a copy of any engagement letter between Bryan Cave and MHP or between Bryan Cave and either of the Patels, and do not argue that any express agreement ever existed. Rather, they appear to be claiming that an agreement can be implied from the actions of the parties.

In determining whether the parties' conduct implies the existence of an attorney-client relationship, primary attention should be given to whether the totality of the circumstances implies an agreement by the attorney not to accept other representations adverse to the putative client's personal interests. Id. at 1733. One of the most important facts involved in this analysis is "the expectation of the client based on how the situation appears to a reasonable person in the client's position." Id.

Plaintiffs' primary argument is that the December 26, 2012 email chain shows that Bryan Cave agreed to represent MHP, at least with regard to "regulatory" and "change of control" matters. Although Rinearson initially indicated to Ferhan Patel that she might be able to represent plaintiffs and ACS – though there would be "a special form of a conflict waiver needed" – she advised him a few hours later that Bryan Cave could not "represent both ACS and MH Pillars in the sale transaction between ACS and MH Pillars – even if the commercial terms have been agreed upon." Ferhan Decl. ¶¶ 13-15, Exhs. 7-8; see also Rinearson Decl. ¶ 10. She added in that same email sent at 9:53 p.m., that "it appears we can provide regulatory advice for both parties on licensing and the change of control issues . . . . I'll follow up on this." Id. This clearly indicates that as of December 26, 2012, plaintiffs knew that they were not represented by Bryan Cave.

Nevertheless, neither Ferhan Patel nor Robinson (who was copied on the email string) responded to Rinearson's statement about the possibility of providing joint regulatory advice to both parties. Rinearson Decl. ¶ 12. As a result, Rinearson did not run an additional conflict check on MHP, as was her firm's practice before agreeing to represent any client. Rinearson Decl. ¶¶ 6, 12 & Exh. A; see also Declaration of K. Lee Marshall in opposition to plaintiffs' motion ("Marshall Decl.") ¶ 7. Rinearson did not

13

prepare an engagement letter for MH Pillars, and did not enter into an attorney-client relationship with MH Pillars. Rinearson Decl. ¶ 12; see also Marshall Decl. ¶¶ 6-7. For his part, Robinson recalls being on a conference call with Rinearson and the Patels, during which Ferhan Patel asked Rinearson if she could represent both parties on the deal. He says she told them shortly thereafter that she could not. Robinson Decl. ¶ 7.

Ferhan Patel asserts that Bryan Cave never asked MHP to execute a conflict waiver or never provided a separate engagement letter. See Ferhan Decl. ¶ 19. Plaintiffs now argue that this provides evidence of representation, and Ferhan Patel claims in his supplemental declaration that Rinearson "never conditioned her provision of regulatory advice to MHP on its execution of a separate engagement letter with Bryan Cave, and that "[s]he understood we were paying her pursuant to the engagement letter between ACS and Bryan Cave." Ferhan Supplemental Declaration ("Ferhan Supp. Decl.") ¶ 11.

Ferhan Patel also contends that Rinearson "never asked us to have our own legal counsel review anything [and that to the contrary] her conduct indicated that she knew we did not have our own legal counsel." Ferhan Supp. Decl. ¶ 7. He does not explain what he means by "her conduct," except to say that "[s]he never asked about our attorneys or anything like that." Id.

However, the court finds no support for the claim that Rinearson owed some duty to MHP or the Patels. Whether Rinearson knew or did not know that plaintiffs did not have legal counsel is not relevant. Moreover, her law partner, Lou Spelios ("Spelios"), who was initially involved in drafting the transaction documents for ACS, clearly believed MHP was represented by counsel, per the December 27, 2012 email exchange between Spelios, Rinearson, and Robinson. See Declaration of Louis Spelios in opposition to plaintiff's motion ("Spelios Decl.") ¶¶ 3-4 & Exhs. A & B.

Plaintiffs claim that the fact that MHP paid the $15,000 retainer to Bryan Cave on behalf of ACS also shows that there was an attorney-client relationship between MHP and Bryan Cave. Ferhan Patel states that MHP paid Bryan Cave the $15,000 on

14

1   December 21, 2012, "pursuant to" the December 19, 2012, engagement agreement
2   between ACS and Bryan Cave. Ferhan Decl. ¶ 10 & Exh. 4. However, the mere fact that
3   MHP paid the retainer on ACS' behalf, at a point when ACS was involved in the sale of
4   the MTL rights to plaintiffs, does not translate into an "agreement" regarding an attorney-
5   client relationship between MHP and Bryan Cave. At most, this payment by plaintiffs
6   shows that they knew, as of December 21, 2012, that Bryan Cave was representing ACS.

The fact that a third party is paying legal fees does not necessarily mean that there is an attorney-client relationship between the attorney and the third party. See, e.g., Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Tech. Inc., 69 Cal. App. 4th 1399 (1999) (attorney owes no professional duties to person who pays his/her legal fees absent an attorney-client relationship); Lasky, Haas, Cohler & Munter v. Sup. Ct., 172 Cal. App. 3d 264, 285 (1985) (fact that trust assets were used to pay legal fees did not establish attorney-client relationship between trust beneficiaries and attorney).

Ferhan Patel claims that he "understood" that the phone calls and emails he participated in with Rinearson and Robinson after December 26, 2012, were "confidential communications for the purpose of obtaining legal advice regarding licensing and change of control issues to the proposed Obopay transaction." Ferhan Decl. ¶ 18. "Specifically," he refers to an entry on a Bryan Cave timesheet (billing invoice) showing that on December 27, 2012, there was a 2.25 hour entry that included (among other tasks) a conference call "with Payza representatives." Ferhan Decl. ¶ 17 & Exh. 6. He "understood these to be confidential communications for the purpose of obtaining legal advice regarding licensing and changer of control issues related to the proposed Obopay transaction, which I understood Rinearson would be structuring with respect to these regulatory compliance issues." Ferhan Decl. ¶ 18.

However, plaintiffs do not dispute Rinearson's contention that all her time on the matter was billed to ACS on invoices sent to ACS. See Rinearson Decl. ¶ 15. Bryan Cave partner K. Lee Marshall confirms that Bryan Cave's records show that the firm did not bill time or send any invoices to plaintiffs, and that plaintiffs did not pay Bryan Cave

15

1   for time that Rinerason (or any Bryan Cave attorney) allegedly spent advising them.  See
2   Marshall Decl. ¶ 7.  Rinearson states that while MHP occasionally participated in calls
3   she had with ACS, or were copied on emails she sent to ACS, she never understood
4   MHP to be a client of Bryan Cave.  Rinearson Decl. ¶ 14.  She billed all time spent on the
5   transaction to ACS, and sent monthly invoices to ACS.  Rinearson Decl. ¶ 15.  She did
6   not bill MHP.  Indeed, she considers it "not unusual" for an acquiring party to pay the
7   legal fees associated with the transaction.  Rinearson Decl. ¶ 15.

By contrast, the facts surrounding ACS' retention of Bryan Cave reflect the ordinary and expected process for obtaining legal representation.  Robinson approached Rinearson on behalf of ACS during the third quarter of 2012, seeking assistance with the acquisition of Obopay.  Robinson Decl. ¶ 3.  He had several discussions with Rinearson during the latter part of 2012 regarding the possibility of retaining her in connection with the acquisition.  Robinson Decl. ¶ 3.  Rinearson confirms this.  Rinearson Decl. ¶¶ 4-5.  Robinson's plan at the time was for ACS to purchase Obopay, and then at some point thereafter, sell Obopay to MHP.  Robinson Decl. ¶ 5.

Before accepting ACS as a client, Rinearson had Bryan Cave run a conflicts check.  Rinearson Decl. ¶ 6 & Exh. A.  When no conflicts were discovered, Rinearson sent the engagement agreement to Robinson on December 19, 2012, setting forth the terms under which Bryan Cave would represent ACS (only).  Rinearson Decl. ¶ 7 & Exh. B.  Robinson returned the signed agreement to her on December 21, 2012.  Id.  Robinson confirms this.  Robinson Decl. ¶ 4.

Lou Spelios, a Bryan Cave partner located in the Atlanta office, assisted ACS with a proposed corporate acquisition in December 2012 and January 2013.  See Spelios Decl. ¶ 1.  He prepared drafts of transactional documents, though he believes that those drafts were not used to effect the transaction.  Spelios Decl. ¶ 2.  He attaches an email string dated December 27, 2012, between himself, Rinearson, and Robinson, which he states was for the purpose of setting up a conference call to discuss the transaction.  Spelios Decl. ¶¶ 3-4 and Exhs. A & B.  Ferhan Patel was copied on the emails.

Spelios insisted that MHP must have counsel on that call, and Robinson responded that Payza would have counsel. Id. Ferhan Patel's response was that he "forgot to cc Alan." Spelios Decl. Exh. B. Spelios concluded that this was a reference to Alan Noskow, at that time a Patton Boggs attorney. Spelios Decl. ¶ 4. The implication was that MHP was represented by counsel, who would be involved in the conference call.

Ferhan Patel confirms in his supplemental declaration that the "Alan" he referred to was in fact Alan Noskow, although he contends that "[a]t the time of the Obopay transaction," Patton Boggs was not representing plaintiffs or working on the Obopay transaction." Ferhan Supp. Decl. ¶ 9. He now claims that "[i]n order to proceed with a call that Robinson was proposing," he "reached out to Alan Noskow," but he claims that the conference call with Spelios "never happened" and "the parties abandoned the idea of an ACS acquisition of Obopay at about that time." Id.

The remaining events that took place in January 2013 also do not provide any evidence that MHP was represented by Bryan Cave. As of January 10, 2013, Bryan Cave was still representing ACS. See Ferhan Decl. Exh. 10. When Robinson commented to Spelious in an email on that date that it "[l]ooks like we are missing the ACS-Obopay purchase agreement that assigns the stock to Carol in exchange for assuming certain liabilities[,]" Spelios responded that "[t]hat document will need to be negotiated between Ms. Realini and the current owner of the stock of Obopay, Inc." Id.

Robinson asked about a possible "3 party agreement ACS-Obopay-Carol." Id. Spelios responded, "It would not be a three party agreement. There needs to be a share transfer from the existing owner of the Obopay stock to Ms. Realini. ACS is not part of that transaction. Ms. Realini will represent and warrant that she owns the stock of Obopay when she signs the Option Agreement." Id. He added that Bryan Cave could not prepare any of the required documents, because "[w]e do not represent Obopay or Carol Realini." Id.

The parties have provided no emails or other documents dated during the period between January 11 and January 22, 2013. When ACS and MHP finalized the decision

17

to change the deal structure so that ACS would not be a party to the Obopay transaction, in January 2013, Bryan Cave, which had been representing ACS, stepped out of the transaction. Robinson Decl. ¶ 8; see also Rinearson Decl. ¶ 13 ("Because the parties decided that ACS (my client) would not be a party to the transaction, Bryan Cave ultimately did not prepare the documents that were signed on January 31, 2013.").

On January 23, 2013, Robinson wrote to Spelios and Rinearson to say "we are closing the Obopay acquisition tomorrow. Thanks for your help. I suspect we will be needing Judith's services ongoing. Can you please send me the reconciliation of our account?" Ferhan Decl. Exh. 11. On February 4, 2013, Rinearson wrote to say there was $698 owing. Robinson then wrote to Farhan attaching Rinearson's email, and saying "ACS will cover vs. you." Id.

The documents that were signed on January 31, 2013, included the Stock Purchase Agreement and the Option Agreement, under which MHP purchased 9% of Obopay's stock, with the option to purchase the remainder at a later date. Rinearson Decl. ¶ 16. Rinearson understood those documents to have been prepared and negotiated by counsel for Realini and MHP. Id. Robinson also states that after Bryan Cave stepped out of the transaction (because ACS was not going to be a party), Realini's attorney drafted the transaction documents instead. Robinson Decl. ¶ 8.

Ferhan Patel claims that MHP "was not represented by counsel" in the transaction with Realini and Obopay, and agrees that "Realini's attorney prepared the transactional documents." Ferhan Supp. Decl. ¶ 10. He states that MHP had no in-house legal counsel, and no outside lawyer looked over the documents on behalf of MHP. Id.

After the January 31, 2013, transaction, Rinearson was retained by Obopay and opened a separate matter to provide regulatory and change-of-control advice to Obopay with regard to "phase 2." At that point, she had Bryan Cave conduct another conflict check. See id. & Exh. C. From then on, she says she worked exclusively for Obopay representatives, and she recalls having little if any contact with MHP, and recalls no further conference calls that included MHP as a participant. Id.

18

Robinson also worked for Obopay, part-time, after the transaction had concluded. Robinson Decl. ¶ 9. He states that when he was served with the complaint in this lawsuit in April 2015, he retained Bryan Cave, because had been happy with their representation of ACS. Robinson Decl. ¶ 10. As for Martin, he is a former employee of Obopay, Inc., and he retained litigation counsel from Bryan Cave on the advice of Robinson, his former colleague. Martin Decl. ¶¶ 1-3.

Plaintiffs concede that Bryan Cave did not represent them in the transaction involving their acquisition of Obopay, but they assert that Rinearson provided legal advice with regard to "regulatory" matters and "change of control" issues, without providing details of either. However, any advice regarding regulatory matters was provided to ACS, Bryan Cave's client. MHP was included in the emails and conference calls only because it was attempting to acquire the Obopay MHP rights. Once the MHP-ACS deal was restructured to eliminate ACS as a middleman, there is no evidence of any regulatory "advice" being provided by Rinearson or anyone at Bryan Cave to MHP.

Finally, plaintiffs have presented no evidence showing that they exchanged any confidential information with anyone at Bryan Cave. Any information that was shared was also shared with Robinson, who is a defendant in this case and a current client of Bryan Cave. Thus, it would have been impossible for Rinearson to have imparted any unfair advantage to the Bryan Cave attorneys who are currently representing defendants.

## CONCLUSION

In accordance with the foregoing, plaintiffs' motion to disqualify Bryan Cave from representing defendants Realini, Robinson, Martin, and Obopay in this action is DENIED.

**IT IS SO ORDERED.**

Dated: June 30, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge