UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MH PILLARS LTD, et al.,

        Plaintiffs,

     v.

CAROL REALINI, et al.,

        Defendants.

Case No.  15-cv-1383-PJH

**ORDER RE MOTIONS TO DISMISS
FIRST AMENDED COMPLAINT**

     Defendants' motions to dismiss the first amended complaint ("FAC") for failure to state a claim came on for hearing before this court on June 14, 2017.  Plaintiffs MH Pillars Ltd. ("MHP-UK") and MH Pillars Inc. ("MHP-USA") appeared by their counsel Peter Fredman.  Defendants Carol Realini ("Realini"), Rodney Robinson ("Robinson"), Christopher Martin ("Martin"), and Ultralight Inc., f/k/a Obopay, Inc. ("Obopay") appeared by their counsel Lee Marshall and Alexandra Whitworth.  Defendant Accelerated Commerce Solutions, Inc. ("ACS") appeared by their counsel Patricia Welch and Christopher Karagheuzoff.

     Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion of Realini, Robinson, Martin, and Obopay ("Obopay defendants") in part and DENIES it in part, and GRANTS ACS's motion, in which the Obopay defendants filed a joinder.

**BACKGROUND**

Plaintiff MHP-UK is a UK corporation that operates an on-line payment service-provider called "Payza." FAC ¶¶ 1, 12. Plaintiff MHP-USA is a New York corporation that is a wholly-owned subsidiary of MHP-UK. FAC ¶¶ 2, 18. MHP-UK allegedly "incorporated MHP-USA as a wholly-owned subsidiary for the purpose of entering into an agency agreement with Obopay through which Payza money transmission operations would be conducted in the U.S." FAC ¶ 18. Firoz Patel and Ferhan Patel are principals (officers and/or directors) of MHP-UK and MHP-USA.

The following facts are as alleged by plaintiffs in the FAC. In 2012, defendant Obopay (also an on-line payment service-provider) was seeking investors or a sale of its assets. FAC ¶ 14. Defendant Martin was Obopay's "chief compliance officer." FAC ¶ 15. At that same time, Firoz Patel and Ferhan Patel were "seeking a compliance solution for Payza U.S. operations." FAC ¶ 16. Martin traveled to Montreal, Canada, in February 2012, allegedly to "pitch Obopay's compliance solutions" to the Patels, among others. FAC ¶ 17. Plaintiffs assert that Martin represented that Obopay was a "fully licensed money transmitter in the U.S." and had "expertise in MTL compliance." FAC ¶ 19. They claim that it was only after MHP-USA received the proposed "Agent Agreement" in March 2012 that they learned that Obopay was not a fully-licensed money transmitter. Id.

Nevertheless, despite having this information, MHP-USA entered into the Agent Agreement with Obopay on March 28, 2012. FAC ¶ 20. The Agent Agreement provided that Obopay would appoint MHP-USA as its agent and would provide Obopay with certain regulatory compliance services in support of MHP-USA's money transfer services. FAC ¶ 20 & Exh. B. Plaintiffs assert that MHP-USA entered into the Agent Agreement in reliance on Martin's representations that the Obopay MTLs for New York and California were "pending." FAC ¶¶ 20-21; see also FAC Exh. B, Appendix 1.

Plaintiffs allege that about a month after execution of the Agent Agreement, they learned that Obopay was for sale when Martin asked if they were interested in

purchasing it. FAC ¶ 25. However, plaintiffs did not purchase Obopay at that time. By October 2012, Obopay had found a buyer that intended to abandon the U.S. operations and MTLs. FAC ¶ 26. On November 9, 2012, Obopay was sold to an overseas buyer, OBP Investments, Inc. ("OBP"). FAC ¶ 27. Plaintiffs allege that OBP made no effort to comply with the assignment provisions of the Agent Agreement or satisfy regulatory "change of control" requirements. FAC ¶ 28. In addition, OBP took steps to shut down U.S. operations effective December 31, 2012. FAC ¶ 29.

On December 1, 2012, defendant Robinson, "a former Obopay executive," allegedly approached Firoz Patel about purchasing the Obopay MTL assets from defendant ACS, described as Robinson's "new Silicon Valley start-up company." FAC ¶ 30. ACS had acquired the MTL assets from defendant Realini, who had acquired Obopay from OBP). FAC ¶¶ 33, 37. On December 20, 2012, ACS entered into a "Professional Services Agreement" with MHP-USA to perform due diligence and prepare legal documents for the proposed transaction. FAC ¶ 36 & Exh. E. MHP-USA allegedly agreed to pay for the associated legal services. FAC ¶ 36.

Plaintiffs claim that the individual defendants developed and implemented a "transactional structure" that included three agreements (referred to in the FAC as the "2013 Transaction"). See FAC ¶¶ 37-41 & Exhs. F-H.

First, plaintiffs allege, the "old" Obopay made Robinson its Chief Financial Officer, and on January 25, 2013, Robinson executed an employment agreement with Realini, pursuant to which she was hired as Obopay's Chief Executive Officer ("CEO"). FAC ¶ 37(a), (b). On January 30, 2013, OBP sold its shares of Obopay (stripped of non-MTL assets) to Realini in exchange for her assumption of certain U.S. liabilities worth less than $500,000; and on January 31, 2013, the "new" Obopay sold MHP-UK 9% of its preferred stock for $1,250,000 pursuant to the "Obopay Inc. Series A Preferred Stock Purchase Agreement" ("Stock Agreement") in which Obopay covenanted to retain a balance of at least $1,000,000 on deposit in a segregated bank account, as required by MTL licensing agencies. FAC ¶ 37(c), (e), (f) & Exh. F. Thus, the parties to the Stock Agreement are

1   Obopay and MHP-UK.  See FAC Exh. F.

2        Second, on February 4, 2013, the "new" Obopay and Realini entered into the

3   second portion of the "2013 Transaction" – the "Option Agreement" – pursuant to which

4   MHP-UK paid $400,000 for an option to acquire the remaining 91% of stock in Obopay at

5   a future date for $10.  FAC ¶ 37(g) & Exh. G.  Thus, the parties to the Option Agreement

6   are Obopay, Realini, and MHP-UK.  See FAC Exh. G.

7        Third, plaintiffs allege that the "2013 Transaction" also included the "ACS

8   Agreement" – described in the FAC as "an agreement whereby defendant ACS agreed to

9   operate Obopay for plaintiffs' benefit and at plaintiffs' expense during a transition period

10  before MHP-UK acquired the remaining 91% of Obopay stock."  FAC ¶ 38 & Exh. H; see

11  also FAC ¶ 39.  Since the "ACS Agreement" is not dated or signed, it is not entirely clear

12  who plaintiffs believe the parties are, apart from (presumably) ACS.

13       Plaintiffs allege that several issues prevented Obopay from being a fully licensed

14  money transmitter in the U.S., including that Obopay had "effectively abandoned" its MTL

15  assets by early 2012 and by April 2012 was "out-of-compliance for most state licenses

16  because it had no current audit."  FAC ¶ 47(a).  They claim that approvals of the New

17  York and California MTLs were never "imminent" as Martin had represented.  FAC

18  ¶ 47(b).  Plaintiffs claim they were unaware of "[t]hese issues," and they relied on

19  Obopay's "purported compliance expertise" and on Robinson/ACS to perform necessary

20  due diligence and procure the necessary legal advice and structure and implement "a

21  suitable transaction" (as they claim Robinson/ACS had agreed to do).  FAC ¶ 48.

22       Plaintiffs assert that in early 2013, Robinson, Martin, and Realini "decided to

23  double-cross plaintiffs as a means of exiting the 2013 Transaction without repaying the

24  benefits they had obtained from it."  FAC ¶ 49 (citing Doc. 51-7, Realini Decl. in Support

25  of Defs' September 21, 2016, Motion for Bond to Secure Costs and Fees).  Defendants

26  allegedly did this (a) by causing Obopay to report to the U.S. Department of Homeland

27  Security ("DHS") that plaintiffs were engaged in unlawful activity, and (b) by hiring an

28  investigator to pursue the charges privately and then unlawfully charging plaintiffs

4

$25,000 for the cost of the investigator, falsely claiming the charge was for an "audit." Id.

Plaintiffs assert that defendants appeared to be trying to help them obtain the licensure, but in fact were not, and had no intention of resolving any compliance issues. FAC ¶¶ 50-53. Plaintiffs allege that the parties established a "board-level 'Obopay/Payza Compliance Committee' to address the issues," which met on March 28, 2013, with Realini, Robinson, and Martin present on the call, FAC ¶¶ 51-52.

During this meeting, Realini, Robinson, and Martin allegedly represented that they had determined that the existing Obopay agency program was "non-compliant;" that Obopay needed custody and control of an amount equal to U.S. client funds in Obopay/Payza customer accounts for MTL compliance purposes; and that this issue could be resolved through MHP-USA's transfer of the funds and the provision of daily customer balance reports to Obopay. FAC ¶ 52.

Plaintiffs claim that these representations were intentionally false because the defendants did not intend to resolve any compliance issues. FAC ¶ 53. Plaintiffs also assert that defendants failed to disclose that they had already engaged in "hostile action" against plaintiffs, including initiating a private investigation and reporting suspected criminal activity to DHS, "with the intent of reneging on the 2013 Transaction." Id. Plaintiffs claim that defendants made these false representations with the intent of inducing plaintiffs to transfer the funds, and that on April 10, 2013, in reliance on defendants' false representations and non-disclosures, MHP-USA transferred $4 million in customer funds to defendants' control. FAC ¶¶ 53-54. This sum allegedly represented "all Obopay/Pazya U.S. customer funds plus a $100,000 buffer." FAC ¶ 54.

On June 3, 2013, Obopay and Realini sent a letter in which Obopay notified MHP-USA/Payza that in accordance with the provisions of the Agent Agreement, it was suspending all Obopay services and Payza's agency appointment, "in order to avoid a violation of legal requirements, or to investigate or respond to reasonably suspected fraudulent activity." FAC ¶ 55 & Exh. K. The letter directed plaintiffs to immediately "cease doing business under Obopay licenses or otherwise conducting business as an

1  agent of Obopay," and further advised plaintiffs of the termination of the Agent

2  Agreement, effective July 3, 2013.  FAC Exh. K.

3       In the same letter, Obopay and Realini notified MHP-UK that they were rescinding

4  the Option Agreement "because, among other things, Obopay was fraudulently induced

5  into entering into such Option Agreement by the materially false and/or misleading

6  statements, and/or the omission of material information" by MHP-UK and Payza.  Id.

7       Plaintiffs allege that Realini and Obopay never returned or offered to return the

8  $400,000 paid on February 4, 2013, for the rescinded Option Agreement, or the $1

9  million MHP-UK was supposed to recover upon exercise of the option, or the $1.25

10  million redemption price for the preferred shares of Obopay stock, or the $4 million in

11  customer funds transferred to defendants on April 10, 2013.  FAC ¶¶ 56-58.

12       Plaintiffs filed the original complaint in this action on March 25, 2015, alleging

13  causes of action for breach of fiduciary duty (against Realini, Robinson, Martin, and

14  ACS); negligence (against all defendants); breach of contract (Agent Agreement, Stock

15  Agreement, and Option Agreement) and breach of the implied covenant (against Realini

16  and Obopay); fraud and deceit (against all defendants), rescission and restitution (against

17  all defendants), and unfair competition (against all defendants).

18       On March 8, 2017, the court issued an order granting defendants' motions to

19  dismiss, with leave to amend, and denying defendants' motion for a bond ("March 8,

20  2017 Order").  The court dismissed the claims of breach of fiduciary duty, negligence,

21  breach of contract and breach of the implied covenant, fraud and deceit, and unfair

22  business practices with leave to amend, and dismissed the claim of rescission and

23  restitution with prejudice.

24       The court also found that the complaint failed to allege facts sufficient to state a

25  claim against ACS and Omney, Inc. ("Omney" – subsequently dropped from the case)

26  which plaintiffs had asserted under a theory of alter ego liability.  The court granted leave

27  to amend, but found it "unlikely that plaintiffs will be able to state a claim" against those

28  defendants; and stated that if plaintiffs did amend the claims against ACS and Omney,

and if the court subsequently granted a motion to dismiss, the costs would be shifted to plaintiffs. Finally, the court added that "[n]o new causes of action or parties may be added to the amended complaint unless plaintiffs first obtain leave of court."

Plaintiffs filed the FAC on March 30, 2017, asserting four causes of action:

      1)      a cause of action for breach of contract and breach of the implied covenant, including one "count" by MHP-UK against Realini and Obopay (breach of Option Agreement and breach of Stock Agreement); and one "count" by both plaintiffs against ACS (breach of ACS Agreement), FAC ¶¶ 59-74;

      2)      a cause of action for quasi-contract, by MHP-UK against Realini and Obopay, in connection with the rescinding of the Option Agreement, FAC ¶¶ 75-79;

      3)      a cause of action for breach of fiduciary duty and constructive fraud, including one "count" by MHP-UK against Realini, Robinson, Martin, and ACS, also alleging civil conspiracy among Realini, Robinson, and Martin to deprive MHP-UK of the benefits of the "2013 Transaction;" one "count" by MHP-UK against Realini, arising from the rescinding of the Option Agreement and alleging that Realini caused MHP-UK to "refuse to honor the redemption provisions of the Stock Agreement;" and one "count" by plaintiffs against ACS, based on Robinson (as agent for ACS) having fraudulently induced plaintiffs to pay the $25,000 charge for the "audit," and based on ACS "causing plaintiffs to pay Obopay's operating expenses with knowledge that defendants had no intention of performing and were conspiring to deprive plaintiffs the benefits of the 2013 Transaction," FAC ¶¶ 80-100; and

      4)      a cause of action for fraud and deceit, which includes one "count" by MHP-USA against Martin and Obopay, alleging fraudulent inducement in connection with the March 2012 Agent Agreement; one "count" by MHP-USA against Realini, Robinson, and Martin, alleging fraudulent inducement in connection with MHP-USA's April 10, 2013, transfer of $4 million in customer funds to "defendants' control;" and one "count" by plaintiffs against Robinson and ACS, in connection with May 2013 invoice for $25,000 for the "audit" expense which was really a charge for private investigator, FAC ¶¶ 101-123.

**DISCUSSION**

A.     Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  While a complaint does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "[F]actual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

In considering whether the complaint states a claim, the court accepts as true all of the factual allegations contained in the complaint.  Iqbal, 556 U.S. at 1949; see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  However, legal conclusions are "not entitled to the assumption of truth."  Twombly, 550 U.S. at 555.  Nor is the court required to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (quotations and citations omitted).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the

8

document.  See Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007).  The court may

consider matters that are properly the subject of judicial notice, Knievel v. ESPN, 393

F.3d 1068, 1076 (9th Cir. 2005); Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001),

and may also consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v.

Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents

referenced extensively in the complaint and documents that form the basis of a the

plaintiff's claims.  See No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W.

Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

Finally, in actions alleging fraud, "the circumstances constituting fraud or mistake

shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Falsity must be pled with

specificity, including an account of the "time, place, and specific content of the false

representations as well as the identities of the parties to the misrepresentations."  Swartz

v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (citations omitted); see also Sanford v.

MemberWorks, Inc., 625 F.3d 550, 558 (9th Cir. 2010) (citation and quotation omitted).

In addition, the plaintiff must do more than simply allege the neutral facts necessary to

identify the transaction; he must also explain why the disputed representation was untrue

or misleading at the time it was made.  Yourish v. Calif. Amplifier, 191 F.3d 983, 992-93

(9th Cir. 1999).

B.     Defendants' Motions

Realini, Robinson, Martin, and Obopay, joined by ACS, argue that the claims

asserted against them in the FAC should be dismissed pursuant to Rule 12(b)(6), for

failure to state a claim.  In a separate motion, ACS argues that the claims asserted

against it should also be dismissed for failure to state a claim, and that the court should

award sanctions against plaintiffs for filing a frivolous claim.

1.     Breach of contract and breach of the implied covenant

The first cause of action for breach of contract and breach of the implied covenant

of good faith and fair dealing is alleged by plaintiffs against Obopay, Realini, and ACS.

Plaintiffs allege two "counts" under this cause of action – one by MHP-UK against Realini

and Obopay, asserting breach of the Option Agreement and breach of the Stock Agreement, and a second by both plaintiffs against ACS, asserting breach of the "ACS Agreement."[1]  Defendants argue that the FAC fails to state a claim for breach of contract or breach of the implied covenant under either "count."

The elements of a claim of breach of contract under California law are (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach.  Buschman v. Anesthesia Bus. Consultants LLC, 42 F.Supp.3d 1244, 1250 (N.D. Cal. 2014); CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (2008).

In addition, every contract possesses an implied covenant of good faith and fair dealing in which "neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684 (1988).  The scope of the implied covenant depends on the purposes and express terms of the contract.  Carma Developers, Inc. v. Marathon Dev. Calif., Inc., 2 Cal. 4th 342, 373 (1992).  The elements of a claim of breach of the implied covenant are (1) the parties entered into a contract; (2) the plaintiff fulfilled its obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.  Rosenfeld v. JPMorgan Chase Bank, N.A., 732 F.Supp. 2d 952, 968 (N.D. Cal. 2010).

       a.    First "count"

With regard to the first "count," defendants argue that the FAC does not state a claim for breach of the Option Agreement or the Stock Agreement, or for breach of the implied covenant as to either.  As to the Option Agreement, plaintiffs allege in the FAC that "Realini and Obopay breached the Option Agreement by rescinding it."  FAC ¶ 65.

---

[1]  The court notes that while plaintiffs have pled breach of the ACS Agreement in the FAC as one "count" of the cause of action for breach of contract, and thus have arguably not added it as a new cause of action, there was no mention of the ACS Agreement in the original complaint and no claim of breach of contract against ACS.

Defendants assert that neither Realini nor Obopay rescinded the Agreement because they did not comply with the actions required to effectuate a rescission of a contract under California law – in particular, they did not "restore to [MHP-UK] everything of value which [they] received . . . under the contract or offer to restore the same upon condition that [MHP-UK] do likewise[,]" as required under Cal. Civ. Code § 1691. And, they add, because the Agreement was not rescinded, plaintiffs could still have exercised the option.

In addition, defendants contend, plaintiff's performance or excuse for nonperformance is an essential element of a claim for breach of contract. Here, they argue, while MHP-UK includes an allegation that plaintiffs "performed all their obligations under each of these contracts except where performance was excused," FAC ¶ 64, it does not allege any facts supporting this claim. Most importantly, they assert, MHP-UK does not allege the most important fact of performance under an Option Agreement – that it ever exercised the option. They contend that without exercise of the option, MHP-UK cannot complain that either Realini or Obopay breached the Option Agreement.

As to the Stock Agreement, plaintiffs allege that Realini "caused Obopay to breach the Stock Agreement by refusing to tender the redemption price[.]" FAC ¶ 65. Defendants assert, however, that Realini was not a party to the Stock Agreement and thus could not have breached it. Moreover, they note, plaintiffs have failed to allege facts showing which provisions of the Agreement were breached, or how, as the court previously directed. They also assert that the FAC does not point to any provision of the Stock Agreement that required "redemption," and under what circumstances.

Defendants argue further that the FAC does not state a claim for breach of the implied covenant, but instead simply recites the legal principle that "[u]nder California law, an implied covenant of good faith and fair dealing is read into every contract." FAC ¶ 63. Defendants assert that plaintiffs have alleged no facts sufficient to state a claim of breach of the implied covenant, and argue that if plaintiffs are relying on the same behavior as alleged in support of the breach of contract claim, the breach of implied covenant claim should be dismissed as superfluous.

1    In opposition, plaintiffs argue that the FAC states a claim on behalf of MHP-UK

2  against Realini and Obopay for breach of the Option Agreement and its implied covenant

3  of good faith and fair dealing (which they do not separately address). They assert that

4  the FAC adequately alleges that Realini and Obopay breached the Option Agreement

5  when Realini issued the rescission letter, because this act had the intent and effect of

6  destroying the entire object and purpose of the "2013 Transaction." See FAC ¶¶ 60-65.

7    In the FAC, plaintiffs allege that the intent of the "2013 Transaction" was that MHP-

8  UK would take ownership of 9% of Obopay immediately and would acquire the remaining

9  91% upon exercise of the option, thereby recovering the $1 million that defendants had

10  allegedly agreed to hold for its benefit in a segregated bank account. FAC ¶ 62.

11  Alternatively, they assert, if MHP-UK elected not to exercise the option, it would have the

12  right to redeem its 9% share of the stock for $1.25 million. Id.

13    Plaintiffs contend that Realini understood that the object of the transaction was to

14  deliver Obopay's MTL assets to MHP-UK. They assert that Realini also knew that MHP-

15  UK had invested in the transaction based on the agreement that it would recover $1

16  million in a segregated Obopay bank account upon exercise of its option. They contend

17  that Realini knew she was being paid $10,000/mo. to do "virtually nothing" other than

18  temporarily hold a majority interest in Obopay until such time as MHP-UK could exercise

19  its option. They claim that Realini's conduct breached the implied covenant of good faith

20  and fair dealings because it had the intent and effect of frustrating MHP-UK's rights to

21  receive the benefits of the "2013 Transaction" as "embodied in" the Option Agreement.

22    With regard to the claim of breach of the Option Agreement, the court finds that

23  the motion must be DENIED. At the time Realini notified plaintiffs of the purported

24  rescission, the Option Agreement was a unilateral contract because Obopay and Realini

25  had merely offered MHP-UK the right to purchase the stock. MHP-UK paid to keep the

26  offer open for a specified period of time, but could "accept" the offer only by exercising

27  the option. In other words, performance by Realini and Obopay was required only at the

28  point that MHP-UK exercised the option. Until the option was exercised, the contract was

12

1  unilateral.

2    However, defendants' purported rescission was ineffective because they failed to

3  return the consideration.  Whether framed as a claim of breach of contract or a claim of

4  breach of he implied covenant, the cause of action as it relates to the Option Agreement

5  raises factual issues that cannot be resolved on a Rule 12(b)(6) motion.  Thus, the court

6  finds that for purposes of the present motion, the claim may proceed.

7    However, this cause of action does fail to state a claim for breach of the Stock

8  Agreement, and the motion is GRANTED as to that part of the claim.  In addition, by

9  failing to oppose defendants' motion, plaintiffs have effectively abandoned that part of the

10  claim.

11                b.    Second "count"

12    In the second "count," plaintiffs allege that in the ACS Agreement, ACS "agreed to

13  manage Obopay operations and protect plaintiffs' interests in the 2013 Transaction."

14  FAC ¶ 68 & Exh. H.  Specifically, plaintiffs assert that ACS "agreed to provide transparent

15  and honest accounting for the Obopay expenses that plaintiffs agreed to pay during the

16  transition period."  Id.

17    Plaintiffs allege that ACS breached the ACS Agreement when Robinson engaged

18  with other defendants in the conspiracy to "deprive plaintiffs of the benefits of the 2013

19  Transaction, including causing Obopay to make allegations against plaintiffs to DHS and

20  to hire an investigator to pursue those investigations privately."  FAC ¶ 69.  They also

21  assert ACS breached the Agreement "by continuing to collect money for Obopay's

22  operational expenses from plaintiffs with knowledge that defendants did not intend to

23  perform the 2013 Transaction" as well as "when it charged the $25,000 cost of the private

24  investigator to plaintiffs under the false pretense that it was an Obopay audit expense."

25  FAC ¶¶ 70-71.

26    ACS argues separately that the FAC does not plead facts sufficient to state a

27  claim for breach of contract, because the ACS Agreement (FAC Exh. H) is not an

28  enforceable contract.  Here, ACS argues, there is no indication from the allegations in the

13

FAC or from the ACS Agreement that such mutual assent existed.

ACS asserts that the ACS Agreement is not signed, and there is no other manifestation of assent; that neither the FAC nor the purported Agreement identifies which plaintiff allegedly entered into the Agreement; and that the terms of the purported Agreement are not sufficiently definite to create enforceable obligations. ACS also contends that the FAC alleges no facts showing breach of the purported Agreement under any of the three theories of breach set forth in FAC ¶¶ 69-71.

In opposition, plaintiffs argue that the ACS Agreement is an enforceable contract, that the FAC adequately alleges breach of that contract, and that the FAC adequately alleges breach of the implied covenant. With regard to the enforceability of the Agreement, plaintiffs simply assert that "[t]he ACS Agreement speaks for itself," and that ACS's arguments concerning the enforceability of the Agreement "contravene the fact allegations of the FAC and the content of the Agreement itself." See Pltfs' Opp. at 12.

Plaintiffs also claim that the FAC "adequately alleges that it was Robinson, ACS's sole agent and operator at the time, who prepared this document," pointing to allegations in FAC ¶¶ 31-32, 37-46, and also pointing to the purported Agreement itself (Exh. H). Finally, plaintiffs contend that the terms of the Agreement are not vague, as ACS claims, when they are considered "in the context of the 2013 Transaction[,]" and argue that the fact that Robinson did not specify which of the two plaintiffs were parties to the Agreement simply suggests that he was "promising the same thing to both of them, or saw no meaningful distinction between them." Id.

The court finds that the motion to dismiss the breach of contract claim against ACS must be GRANTED. The purported ACS Agreement is not an enforceable contract, and the FAC does not allege facts showing breach. To form a contract, the parties must provide mutual assent. See Cal. Civ. Code §§ 1550, 1565; Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 207-08 (2006). If there is no manifestation of mutual assent, there is no contract. See Specht v. Netscape Commn's Corp., 306 F.3d 17, 28-29 (2d Cir. 2002) (applying California law). The FAC does not identify which of the two plaintiffs entered

into the purported Agreement, but alleges only that "[b]oth plaintiffs entered into or were intended beneficiaries of the ACS Agreement." See FAC ¶ 60.

However, a review of the purported ACS Agreement shows no manifestation of assent by ACS or by either plaintiff. The purported Agreement makes no mention of MHP-UK or MHP-USA, referring only to "MH Pillars" and "Payza." See FAC Exh. H. Because the FAC does not identify the entity to which ACS allegedly owed contractual duties, plaintiffs cannot properly plead the existence of a contract. Moreover, the purported Agreement is unsigned, and does not even include a signature block.

Nor does the FAC plead facts relating to contract formation that would indicate mutual assent – for example, facts about who prepared the purported Agreement, who approved it, or when it was allegedly approved or executed. Plaintiffs claim that ¶¶ 31-32 and 37-46 of the FAC adequately allege that Robinson prepared the purported Agreement. However, as noted below, the paragraphs of the FAC cited by plaintiffs do not in fact say that the purported Agreement was prepared by Robinson, and certainly there are no allegations showing that it was approved or executed, or when.

FAC ¶ 31 alleges that Robinson was the agent of ACS; ¶ 32 alleges that Robinson represented that he was acting on behalf of ACS; ¶ 37 alleges that ACS and Robinson "developed and implemented" a "transactional structure" that resulted in the Stock Agreement and the Option Agreement; ¶ 38 alleges that this "transaction" included the ACS Agreement; ¶ 39 alleges that in this Agreement, ACS "agreed" to provide certain services "through Robinson;" ¶ 40 alleges that the Stock Agreement, the Option Agreement, and the ACS Agreement were all part of the "2013 Transaction;" ¶ 41 alleges that "Robinson/ACS" represented to "plaintiffs" that "he had structured the 2013 Transaction with the assistance of legal counsel to achieve the goals of making Obopay a fully licensed money transmitter in the US" and "of delivering ownership of Obopay to MHP-UK . . . where it could be merged into MHP-USA;" ¶ 42 alleges that MHP-USA wired $1.65 million to Obopay "in reliance on the above representations by Robinson/ACS;" ¶ 43 alleges that MHP-USA, "pursuant to the ACS Agreement," then

began paying Obopay's operating expenses; ¶ 44 alleges that, also "pursuant to the ACS Agreement," ACS moved the Obopay operations to its office;" ¶ 45 alleges that the day-to-day operations consisted of two Obopay compliance staff employees; and ¶ 46 alleges that Realini's only role in Obopay was to "hold its equity and sit on its board," that "Robinson/ACS acted as president."

The purported Agreement consists of a vague list of potential terms, some of which appear to relate to ACS, and some of which do not, but none of which are enforceable. For example, ¶ 1 of the purported Agreement refers to Robinson serving as Obopay's compliance board director, and states that Robinson "will vote and protect the interests of MH Pillars." FAC Ex. H ¶ 1(b). However, the FAC pleads no facts showing that Robinson ever served on Obopay's board or as its president, as seemingly required under the purported Agreement. Plaintiffs simply allege that "Robinson/ACS acted as president," with a citation to the purported ACS Agreement. See FAC ¶ 46 (citing Exh. H). In addition, neither the purported Agreement nor the FAC indicates what is meant by "vot[ing] and protect[ing] the interests of MH Pillars," or explains which of plaintiffs' vague "interests" Robinson or ACS was allegedly promising to protect. These generalized promises are insufficiently definite to impose enforceable obligations on ACS.

Paragraph 2 is also too indefinite to create enforceable obligations. While it appears to contain somewhat less vague promises by ACS related to services Robinson would perform as president of Obopay, it is immediately followed by a list of "Possible changes" to some of those promises. See FAC Ex. H, ¶ 2. The fact that this unsigned, undated "Agreement" contains a list of changes to the obligations ACS is allegedly undertaking pursuant to the Agreement simply underscores the unenforceability of those alleged obligations.

In addition, the FAC pleads no facts showing breach of the purported ACS Agreement, under any of plaintiffs' three theories. Under the first theory, ACS (acting through Robinson) allegedly breached its agreement to "protect" plaintiffs' "interests" in the "2013 Transaction," when Robinson, acting as ACS's agent and in concert with the

16

other individual defendants, caused "Obopay to make allegations against plaintiffs to DHS and to hire an investigator to pursue those allegations privately." FAC ¶¶ 68-69.

However, this claim is based on the alleged collective conduct of all three individual defendants, none of whom were alleged to be parties to the purported ACS Agreement. Moreover, the purported ACS Agreement is not referenced in the Stock Agreement or the Option Agreement, and neither the Stock Agreement nor the Option Agreement is mentioned in the purported ACS Agreement – even though plaintiffs claim the ACS Agreement formed one part of the "2013 Transaction," with the other two Agreements forming the other parts. See FAC ¶ 61.[2]

Even if the allegations could be interpreted to apply to Robinson, the FAC would still fail to allege a breach. The suggestion that Robinson's alleged participation in the hiring of Deloitte and subsequent reporting to DHS violated ACS's alleged promise to "protect" plaintiffs' interests is without merit, as that interpretation would effectively impose a contractual duty on ACS to conceal any alleged illegal activity of plaintiffs so as not to breach its obligation to protect "MH Pillars." Such a duty would be illegal, against public policy, and unenforceable, see Cal. Civ. Code §§ 1550, 1608, and would directly contradict Robinson's alleged duties as Obopay's compliance board director, thus causing a breach of a different alleged promise in the purported ACS Agreement.

Under the second theory, plaintiffs allege a breach based upon the allegation that ACS continued "to collect money for Obopay's operational expenses" during the transitional period. FAC ¶ 70; see also FAC ¶ 43. Most of these expenses would have been associated with ensuring Obopay's compliance with applicable laws, which was the primary purpose of the purported ACS Agreement as illustrated by its alleged "terms." See FAC Exh. H ¶ 1 (Robinson to serve as compliance board director); id. ¶ 2(b)

_____

[2] The court notes in addition that the Stock Agreement and the Option Agreement, separately, each include an integration clause. See FAC Exh. F ¶ 6.4; Exh. G ¶ 6.5(a). In California, an integration clause offers persuasive evidence that the parties intended the writing to be a final expression of their agreement as to the stated subject matter. See Sussex Fin. Enters., Inc. v. Bayerische Hypo-Und Vereinsbank AG, 460 Fed. Appx. 709, 711 (9th Cir. 2011).

(Robinson to manage compliance officer); id. ¶ 2(c) (Robinson to ensure that Obopay is in good standing); id. ¶ 2(e) (Robinson to recruit compliance officer for long term role); id. ¶ 2(f) (Robinson to represent Obopay to state regulators); and id. ¶ 2(g) (Robinson to serve as compliance officer if Martin leaves).

However, according to the FAC, it was Obopay, not ACS, that was supposedly responsible for invoicing "MH Pillars" for Obopay's expenses. See FAC Exh. H ¶ 2(h). Indeed, the FAC alleges that MHP-USA began paying Obopay's expenses after January 31, 2013, during which time Obopay was in operation, including having its compliance staff working to renew MTLs and re-apply for lapsed or abandoned MTLs, and having weekly meetings with plaintiffs. See FAC ¶¶ 44-45, 51. Moreover, the FAC pleads no facts showing that Obopay did not incur the operational expenses for which it invoiced plaintiffs.

Under the third theory, plaintiffs allege breach based on the $25,000 charge from Deloitte. See FAC ¶ 71. This charge does not constitute a breach of the purported ACS Agreement. To the contrary, hiring the accounting firm Deloitte to investigate financial matters related to plaintiffs' operations arguably furthered the primary purpose of the purported ACS Agreement, which was to ensure Obopay's compliance with applicable laws and regulations. Thus, the hiring of Deloitte was consistent with this alleged obligation to maintain compliance at Obopay. In short, plaintiffs fail to allege facts showing how ACS's alleged involvement with the $25,000 charge could be found to breach a promise made by ACS under the purported ACS Agreement.

The allegations relating to the $25,000 charge are also lacking in specificity. Plaintiffs begin by alleging that the individual defendants all charged "plaintiffs" for the $25,000 auditing expense to Deloitte, which plaintiffs refer to as a "private investigator." See FAC ¶ 49(b). Later, plaintiffs claim that ACS charged "plaintiffs" for the expense. FAC ¶ 71. Later still, they claim that "Robinson, as agent for ACS, in connection with the ACS Agreement, caused Obopay to transmit an invoice to plaintiffs that included" the $25,000 charge. FAC ¶ 116. In addition, they allege that the "plaintiffs" were charged

18

with the $25,000, FAC ¶¶ 49(b), 71, 116, but then also claim that MHP-USA actually paid the $25,000, FAC ¶¶ 49(c), 119.

Finally, the claim of breach of the implied covenant must be dismissed, because the FAC does not allege facts sufficient to support the required elements (and does not even attempt to allege those elements).

2.    Quasi-contract

The second cause of action for quasi-contract is asserted by MHP-UK against Realini and Obopay, in connection with the rescinding of the Option Agreement, seeking restitution and "consequential" damages.

Defendants contend that the quasi-contract claim should be dismissed for failure to state a claim, and, more importantly, because it is a new cause of action added to the FAC in contravention of the court's directive in the March 8, 2017, Order that plaintiffs could assert no new causes of action in the amended complaint without leave of court.

The elements of a claim of quasi-contract or unjust enrichment are (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense. Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1593 (2008). Unjust enrichment is an equitable claim that sounds in implied or quasi-contract. See Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir.1996). "The doctrine applies where plaintiffs, having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." Hernandez v. Lopez, 180 Cal. App. 4th 932, 938 (2009).

Defendants contend that plaintiffs have made no effort to plead any facts showing an entitlement to relief under a quasi-contract theory. Instead, they assert, the quasi-contract cause of action merely states conclusions of law, without supporting facts. Moreover, they argue, this case could not be governed by quasi-contract when there are several express contracts that govern the relationship of the parties.

In opposition, plaintiffs first contend that they did not intentionally violate the

court's instruction in the prior order with regard to amending the complaint. In the original complaint, plaintiffs asserted a cause of action for "rescission and restitution." In the March 8, 2017, Order, the court dismissed the rescission claim because in California, rescission is a remedy, not a cause of action, and restitution is not a stand-alone cause of action. The court added that "[r]estitution can be sought as a remedy in a quasi-contract cause of action." See Order at 15 (citations omitted).

Plaintiffs now claim that they interpreted this as an invitation to allege a claim of quasi-contract in the FAC, and argue that the FAC states an "alternative claim" against Realini for quasi-contract based on her unilateral rescission of the Option Agreement. However, the Order also clearly stated that "[n]o new causes of action or parties may be added to the amended complaint unless plaintiffs first obtain leave of court." Order at 26.

The court finds that the motion to dismiss the quasi-contract cause of action must be GRANTED. First, and most importantly, plaintiffs failed to seek leave to add this claim to the amended complaint, in contravention of the March 8, 2017, Order. In addition, plaintiffs' entire case is based on the claim that express contracts governed the parties' relationship, and "a quasi-contract cause of action does not lie where . . . express binding agreements exist and define the parties' rights." See Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94 Cal. App. 4th 151, 172 (2001). While it is true that Rule 8 allows a plaintiff to plead "alternatively or hypothetically," see Fed. R. Civ. P. 8(d)(2), the court previously directed that plaintiffs could add no new claims without leave of court, and it is undisputed that the quasi-contract cause of action is a new claim and that plaintiffs did not seek leave to add it to the FAC.

3.    Breach of fiduciary duty and constructive fraud

In the third cause of action for breach of fiduciary duty and constructive fraud, plaintiffs assert three "counts" against all defendants except Obopay. Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship. Assilzadeh v. Cal. Fed. Bank, FSB, 82 Cal. App. 4th 399, 415 (2000) (citation and quotation omitted). The claim of constructive fraud alleged here is a new claim, not

1    previously asserted by plaintiffs.  As noted above, with regard to the claim for quasi-

2    contract, the court previously directed that in amending the complaint, plaintiffs must seek

3    leave of court before adding any new claims or parties.  Plaintiffs did not seek leave to

4    add this cause of action.  Accordingly, the motion to dismiss the constructive fraud claim

5    is GRANTED.

6          As for the claim of breach of fiduciary duty, the first "count" is a claim by MHP-UK

7    in its capacity as a minority shareholder, alleging civil conspiracy among Realini, Martin,

8    and Robinson to deprive MHP-UK of the benefits of the "2013 Transaction," and alleging

9    respondeat superior liability against ACS (based on Robinson's alleged role as ACS's

10   agent). FAC ¶¶ 85-91.

11         The second "count" is a claim by MHP-UK against Realini, based on her

12   "rescinding the Option Agreement," and "causing MHP-UK to refuse to honor the

13   redemption provisions of the Stock Agreement."  FAC ¶¶ 92-93.

14         The third "count" is a claim alleging that ACS breached the fiduciary duty it owed

15   "plaintiffs" in connection with the purported ACS Agreement, when Robinson (as agent of

16   ACS) fraudulently induced plaintiffs to pay the $25,000 audit charge, and when it caused

17   plaintiffs to pay Obopay's operating costs with knowledge that defendants did not intend

18   to perform the "2013 Transaction."  FAC ¶¶ 94-97.

19         Defendants contend that the FAC fails to state a cause of action for breach of

20   fiduciary duty.  The elements of a cause of action for breach of fiduciary duty are

21   (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage

22   proximately caused by the breach.  Stanley v. Richmond, 35 Cal. App. 4th 1070, 1086

23   (1995).  There must be an adequate showing of each of these elements in order to plead

24   a cause of action for breach of fiduciary duty.  See Yamauchi v. Cotterman, 84 F.Supp.

25   3d 993, 1016 (N.D. Cal. 2015); City of Atascadero v. Merrill Lynch, Pierce, Fenner &

26   Smith, Inc., 68 Cal. App. 4th 445 (1998).

27         Under California law, a fiduciary relationship is a special circumstance in which the

28   fiduciary "assumes duties beyond those of mere fairness and honesty" and "must

21

undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary." Comm. On Children's Television, Inc. v. Gen. Foods Corp., 35 Cal.3d 197, 222 (1983). "The obligation to put the interests of the other party first is why a fiduciary relationship generally does not arise out of ordinary arms-length business dealings. In a typical business contract or relationship, one party does not commit to act in the other party's best interest rather than in its own." World Surveillance Grp., Inc. v. La Jolla Cover Investors, Inc., 66 F.Supp. 3d 1233, 1235 (N.D. Cal. 2014). Thus, a fiduciary duty will be found only where an individual or entity has knowingly undertaken that high duty or when the law imposes the duty in special relationships such as agency, partnership, or joint venture. Id.

Under a conspiracy theory of liability, each member of the conspiracy may be held jointly liable as a tortfeasor, even though he or she may not have participated directly in the underlying tort. Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 574 (2005). However, there is no separate tort of civil conspiracy and no action for conspiracy to commit a tort unless the underlying tort is committed and damage results therefrom. Unruh v. Truck Ins. Exch., 7 Cal. 3d 616, 631 (1972). To plead civil conspiracy, a plaintiff must allege facts showing "(1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." Rusheen v. Cohen, 37 Cal. 4th 1048, 1062 (2006).

a.    First "count"

The first "count" is asserted against Realini, Martin, Robinson, and ACS. Plaintiffs allege that Realini, Martin, and Robinson breached their fiduciary duties toward MHP-UK (a) by engaging in a conspiracy to deprive MHP-UK of the benefits of the "2013 Transaction," including by causing Obopay to make allegations about plaintiffs to DHS and hiring an investigator to pursue those allegations privately, for which they assert ACS is also liable under a theory of respondeat superior, FAC ¶¶ 86, 90; (b) by deceiving "plaintiffs" into transferring $4 million to their control under false pretenses, FAC ¶ 87; and (c) by failing to truthfully disclose their actions, intentions, and concerns regarding the

22

1   MTL compliance issues, falsely acting as though they intended to perform the 2013

2   Transaction in good faith, and continuing to have their salaries and Obopay's expenses

3   paid by the plaintiffs under those circumstances, FAC ¶¶ 88, 91.

4        Defendants contend that this "count" should be dismissed because there is no

5   fiduciary duty requiring corporate officers to refrain from investigating and reporting

6   unlawful conduct, and indeed, that imposing such a fiduciary duty would be against

7   California public policy; because defendants' communications to DHS are privileged

8   under Civil Code § 47(b) and cannot serve as the basis for tort liability; because this

9   claim alleging "false pretenses" and failure to "truthfully disclose" actions, intentions, and

10  concerns – sounds in fraud and must be pled with particularity, which plaintiffs have not

11  done; and because MHP-UK has failed to plead facts supporting the elements of

12  conspiracy.

13       ACS argues in its separate motion that the FAC fails to state a claim against it

14  based on the alleged conspiracy of Realini, Martin, and Robinson to deprive MHP-UK of

15  the benefits of the "2013 Transaction" by hiring Deloitte to investigate plaintiffs and then

16  reporting plaintiffs to DHS.  ACS contends that these allegations are nearly identical to

17  those that form the basis of plaintiffs' claim against ACS for breach of the purported ACS

18  Agreement, and should be dismissed for the same reason.

19       As for the allegation that ACS is liable through a theory of respondeat superior

20  based entirely upon Robinson's actions, ACS contends that because plaintiffs do not

21  allege that Robinson actually served on Obopay's board or as its president after the 2013

22  Transaction, they allege no fiduciary duty owed to MHP-UK by Robinson that could be

23  imputed to ACS.  Moreover ACS asserts, had plaintiffs alleged such a duty, it could not

24  be imposed on ACS because the FAC only alleges in conclusory fashion that Robinson

25  was acting as ACS's agent, see FAC ¶ 90, which ACS argues is insufficient.  Indeed,

26  ACS asserts, plaintiffs make no effort to establish how Robinson could simultaneously be

27  acting within the scope of his agency with ACS and also as a board member and officer

28  of Obopay owing fiduciary duties to MHP-UK.

ACS argues further that even if plaintiffs had adequately alleged that Robinson owed them a fiduciary duty that also was imputed to ACS, the fiduciary duty claim would still fail for a lack of breach. ACS contends that the hiring of Deloitte and the reporting of plaintiffs to DHS would have been consistent with any fiduciary duties owed to all Obopay shareholders, and that MHP-UK's interests should have aligned with the remaining shareholders, and should have included ensuring that Obopay's operations were compliant with all applicable laws.

In opposition, plaintiffs argue that the FAC adequately alleges that Realini, Martin, and Robinson breached fiduciary duties owed to MHP-UK. They contend that they have pled facts showing that Realini breached fiduciary duties owed to MHP-UK as the majority shareholder and nominal "chief officer" of Obopay, of which MHP-UK was a minority shareholder, because she failed to disclose that she suspected illegal activities and felt obliged to report them to law enforcement, and because she "deceived" MHP-UK into sending Obopay $4 million under the pretext that this would cure the compliance issues, when in fact she never intended to go forward with the "2013 Transaction," including the Option Agreement.

Plaintiffs assert they have pled facts showing that Martin breached fiduciary duties owed to MHP-UK as an officer of Obopay, because he undertook to act for plaintiffs in connection with the "2013 Transaction," and because he joined in with Realini and Robinson at the March 28, 2013 Obopay/Payza Compliance Committee meeting in falsely representing that plaintiffs needed to transfer the $4 million to Obopay to ensure regulatory compliance.

Plaintiffs contend that they have also pled facts showing that Robinson breached fiduciary duties owed to MHP-UK as an officer of Obopay, see FAC ¶ 39 (citing provision of purported ACS Agreement, stating that Robinson would "serve on Obopay board" and would "serve as president of Obopay") of which MHP-UK was a minority shareholder, because he knowingly undertook to act on behalf of plaintiffs in connection with the "2013 Transaction," and because he failed to disclose to plaintiffs that he suspected unlawful

24

activities that he felt obligated to report to law enforcement, see FAC ¶¶ 86-88.

Plaintiffs claim that Robinson assured them in a December 2012 exchange of emails that they could place their trust in him with statements such as "[y]ou can certainly set the salaries of the compliance team as they will eventually work for you" and "[w]e will be very transparent about costs." See FAC, Exh. D. Plaintiffs also assert that Robinson breached his fiduciary duty by intentionally deceiving MHP-UK into sending Obopay $4 million under the false pretext that this would cure the defendants' regulatory concerns. FAC ¶ 87; see also FAC ¶¶ 52-53.

Plaintiffs contend that many of Robinson's breaches of fiduciary duty fall directly within the ambit of the purported ACS Agreement and, thus, constitute direct breaches of fiduciary duty by ACS as well. They claim that ACS directly promised to "provide" Robinson to serve on the Obopay board and "vote and protect the interests" of MHP, and that it directly promised to do the bookkeeping contemplated by the 2013 Transaction in a manner that "insure[d] [a] transparent view of expenses/books [was] provided to" MHP. FAC Exh. H. Plaintiffs concede that Robinson did not collect a salary during these months, but nonetheless assert that he personally benefitted because his company, ACS, continued to profit from the monthly bookkeeping and administration fees it was charging to MHP-USA. See FAC ¶¶ 43(c)-(d).

Plaintiffs point to the allegations in the FAC that "[t]he fiduciary duty imposed in connection with the ACS Agreement required ACS at a minimum to be honest and truthful with respect to the expenses it was charging to plaintiffs," FAC ¶ 94; that "ACS breached this fiduciary duty to plaintiffs when Robinson, in his capacity as the agent of ACS performing the ACS Agreement, fraudulently induced plaintiffs to pay the $25,000 private investigation charges by misrepresenting it as an audit expense," FAC ¶ 95; and that "ACS also breached its fiduciary duty by causing plaintiffs to pay Obopay's operating expenses with knowledge that defendants had no intention of performing and were conspiring to deprive plaintiffs the benefits of the 2013 Transaction, FAC ¶ 96.

The motion to dismiss the first "count" as to Realini, Martin, and Robinson is

GRANTED. With regard to the Deloitte due-diligence investigation and defendants' report of the results of that report to DHS, there is no fiduciary duty requiring corporate officers to refrain from investigating and truthfully reporting unlawful conduct. Moreover, defendants' communication to DHS was privileged under California Civil Code § 47(b), and cannot serve as the basis for tort liability, because those communications were intended to instigate official governmental investigation into wrongdoing, including police investigations. See Hagberg v. Calif. Fed. Bank FSB, 32 Cal. 4th 350, 360 (2004).

Nor have plaintiffs pled fraud with particularity in this "count." For example, they have not alleged any facts supporting the vague allegation that defendants "fail[ed] to affirmatively and truthfully disclose their actions, intentions, and concerns" and that they "falsely acted" like they intended to perform the 2013 Transaction in good faith, as alleged in FAC ¶ 88. To the extent plaintiffs are attempting to allege that defendants never intended to perform under the Stock Agreement and Option Agreement, they do not allege facts sufficient to support such a claim. Additionally, if that is what they are alleging, it is in essence a contract claim, and there are no facts pled in the FAC sufficient to state a claim of conspiracy to breach the contract.

As for plaintiffs' claim that Robinson assumed fiduciary duties to them by undertaking to act on their behalf, which they claim is shown by assurances Robinson made via email in December 2012 regarding salaries and transparency of costs when discussing the unrealized transaction in which ACS would have taken ownership of Obopay, those alleged assurances do not create a fiduciary duty under any circumstances, much less when offered in connection with an unconsummated deal, as was the case here.

The motion to dismiss the first "count" against ACS is also GRANTED. Plaintiffs claim that Robinson owed MHP-UK fiduciary duties because he served as an officer of Obopay, and assert that these fiduciary duties can be imputed to ACS through principles of respondeat superior. However, the FAC does not plead facts showing breach of fiduciary duty by Robinson. Thus, there can be no respondeat superior liability imposed

26

on ACS based on Robinson's actions.

Plaintiffs' argument also fails because Robinson's alleged fiduciary duty flows from his purported service as an Obopay officer. Because he allegedly served as an officer of Obopay under the purported ACS Agreement, any fiduciary duty owed by Robinson would be dependent upon the ACS Agreement. But, as explained above, the purported ACS Agreement is a proposal, not an enforceable agreement, so it cannot serve as the basis for a claim that Robinson served as president, or for imputing Robinson's alleged fiduciary duties onto ACS.

In addition, Robinson could not have simultaneously acted as Obopay's president while also acting as ACS's agent. That is, his scope of employment with ACS cannot include acting as the president of Obopay (a different corporation) and allegedly owing fiduciary duties to both Obopay and its shareholders. Plaintiffs allege no facts nor point to any authority supporting the notion that principles of respondeat superior can be stretched to such an extent.

As for the assertion that Robinson undertook to act on plaintiffs' behalf pursuant to the purported ACS agreement, which indicated that Robinson would act for plaintiffs' benefit, would vote to protect plaintiffs' interests, and would provide plaintiffs a transparent view of Obopay's expenses, those alleged promises do not evidence special circumstances under which ACS undertook responsibilities beyond mere fairness and honesty. Allegations that one party agreed to "act in the best interests" of the other are insufficient to create a fiduciary duty. See World Surveillance Grp., 66 F.Supp. at 1235.

Further, there was no breach of fiduciary duty from the purported ACS Agreement. Even if it were an enforceable contract, it would not create fiduciary obligations in ACS, as it provides no indication that ACS was acting primarily for plaintiffs' benefit, or subordinating its interests to those of plaintiffs.

b.      Second "count"

In the second "count," plaintiffs allege that Realini breached her fiduciary duties towards MHP-UK by rescinding the Option Agreement and by causing Obopay to refuse

to honor the redemption provisions of the Stock Agreement, in order to deprive MHP-UK of the value it was supposed to receive from the "2013 Transaction." FAC ¶ 92.

Defendants argue that these claims fail for the same reason that the identical breach of contract claims fail. In addition, defendants assert, it is well-established that conduct amounting to a breach of contract is not also tortious unless the conduct violates an independent duty arising from principles of tort law. Generally, they note, a failure to perform a contract cannot give rise to tort damages.

In opposition, plaintiffs argue that Realini as the majority shareholder assumed a fiduciary duty to MHP-UK as the minority shareholder, and that she knowingly undertook to serve in those roles for the purpose of furthering MHP-UK's interest in the "2013 Transaction." They contend that Realini continued to pretend to be engaged in business as usual with respect to the "2013 Transaction" right up to the moment she rescinded the Option Agreement. Plaintiffs assert that while Realini obtained "nominal ownership and control" of Obopay through the "2013 Transaction," the fact is that MHP-UK had paid all the consideration she had ostensibly used to purchase it. They claim that in rescinding the option, Realini was using the nominal control of Obopay that MHP-UK had entrusted to her in order to take beneficial ownership of it for herself while also keeping all the consideration MHP-UK had paid for it.

In response to defendants' argument that the rescission cannot be both a breach of contract and a breach of fiduciary duty, plaintiffs respond that a fiduciary duty may arise from a contractual relationship. Indeed, they argue, fiduciary relationships frequently arise based on the contractual intent "to act on behalf of and for the benefit of another."

The court finds that the motion must be GRANTED as to the second "count." Essentially, plaintiffs are attempting to assert that the rescinding of the Option Agreement, which they have challenged under theories of breach of contract and breach of the implied covenant, was also a breach of fiduciary duty. Conduct amounting to a breach of contract is not also tortious unless the conduct "violates an independent duty

1  arising from principles of tort law." Applied Equip. Corp. v. Litton Saudi Arabia, Ltd., 7

2  Cal. 4th 503, 514 (1994). Under California law and the economic loss doctrine, an

3  omission to perform a contract cannot give rise to tort damages when a plaintiff claims

4  only economic loss, as plaintiffs do here. See Aas v. Superior Court, 24 Cal. 4th 627,

5  643 (2000); see also Oracle USA, Inc. v. XL Global Servs., Inc., 2009 WL 2084154, *4

6  (N.D. Cal. July 13, 2009).

7       The second "count" alleges nothing more than a breach of contract claim, and this

8  case does not provide one of the limited situations where such a claim might be viable.

9                c.     Third "count"

10       In the third "count," plaintiffs allege that the fiduciary duty imposed in connection

11  with the purported ACS Agreement required ACS to be honest and truthful with respect to

12  the expenses it was charging to plaintiffs, and that ACS breached this duty when

13  Robinson, in his capacity as the agent of ACS performing the purported ACS Agreement,

14  fraudulently induced plaintiffs to pay the $25,000 "private investigation charge" by

15  misrepresenting it as an audit expense. FAC ¶¶ 94-95. Plaintiffs also allege that ACS

16  breached its fiduciary duty by causing "plaintiffs" to pay Realini's and Martin's salaries

17  and ACS's bookkeeping and office expense fees, with knowledge that defendants had no

18  intention of performing and were conspiring to deprive "plaintiffs" of the benefits of the

19  "2013 Transaction." FAC ¶ 96.

20       ACS argues there is no breach of fiduciary duty based on the purported ACS

21  Agreement, and that this "count" fails to identify which plaintiff is allegedly owed the

22  fiduciary duty by ACS. First, ACS asserts, the purported Agreement is not an

23  enforceable contract, and plaintiffs allege no facts showing how the purported Agreement

24  imposes a fiduciary duty on ACS.

25       ACS contends that the allegation that ACS owed a fiduciary duty to be "honest and

26  truthful" with respect to the expenses it was charging plaintiffs, see FAC ¶ 94, is

27  insufficient to support this claim because a fiduciary duty must be based on more than

28  just the duty to be honest, which is imposed on any contracting party. ACS asserts that

United States District Court
Northern District of California

1   to the extent that it undertook any obligations, they would have related primarily to

2   maintaining compliance of the Obopay MTLs with applicable laws, and not to any special

3   duties owed to plaintiffs. Without more, ACS argues, plaintiffs cannot demonstrate the

4   existence of any fiduciary duty.

5       ACS also argues that plaintiffs fail to allege how participating in the invoicing of

6   Obopay's expenses, including the $25,000 charge for Deloitte, could have breached any

7   fiduciary duties owed by ACS. ACS adds that even assuming for the sake of argument

8   that its participation in the invoicing of Obopay's expenses was not "honest and truthful,"

9   as plaintiffs allege, such activity would merely constitute a breach of the purported ACS

10  Agreement, and not a breach of a fiduciary duty.

11      In opposition, plaintiffs assert that the FAC establishes that Robinson himself

12  owed a fiduciary duty as an officer of Obopay to MHP-UK as a minority shareholder, and

13  that Robinson knowingly undertook to act for the benefit of plaintiffs in connection with

14  the "2013 Transaction." As above, with regard to the first "count," plaintiffs contend this is

15  shown by Robinson's assurances that "[y]ou can certainly set the salaries of the

16  compliance team as they will eventually work for you" and "[w]e will be very transparent

17  about costs." See FAC, Exh. D (December 15, 2012, email relating to negotiations over

18  plaintiffs' acquisition of the Obopay MTL rights). As before, they argue that Robinson's

19  alleged fiduciary duties can also be imputed to ACS.

20      In addition, plaintiffs assert that ACS directly undertook fiduciary obligations to

21  both plaintiffs by virtue of the purported ACS Agreement, pursuant to which they claim

22  that ACS directly promised to "provide" Robinson to serve on the Obopay board and

23  "vote and protect the interests" of MHP, and that it directly promised to do the

24  bookkeeping contemplated by the "2013 Transaction" in manner that "insure[d] [a]

25  transparent view of expenses/books [was] provided to" plaintiffs. See FAC Exh. H.

26      Finally, plaintiffs contend that just like Realini, Robinson had a fiduciary duty that

27  required him to disclose to plaintiffs that he suspected unlawful activities that he felt

28  obliged to report to law enforcement. They assert that this fiduciary duty prevented him

30

from concealing these facts for months in order to cause plaintiffs to continue paying for Obopay's operations. In addition, they also appear to be suggesting that this alleged fiduciary duty should be imputed to ACS.

The court finds that the motion must be GRANTED as to the third "count." Plaintiffs have alleged no facts showing that ACS owed them a fiduciary duty. The purported ACS Agreement is not an enforceable contract, and plaintiffs allege no facts showing how it imposes a fiduciary duty on ACS (or on anyone).

The allegation that ACS owed a fiduciary duty to be "honest and truthful" with regard to the expenses it was charging plaintiffs is insufficient to support this claim. A fiduciary duty must be based on more than just the duty to be honest, which is imposed on any contracting party. See Comm. On Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 222 (1983). Plaintiffs allege no facts showing that ACS undertook any obligations in addition to those that would attach to any party under a contract, and that to the extent that it undertook any obligations, they would have related primarily to maintaining compliance of the Obopay MTLs with applicable laws, and not to any special duties owed to plaintiffs.

As for the $25,000 audit charge, plaintiffs allege no facts showing how ACS owed either of the plaintiffs a fiduciary duty in connection with commissioning the audit or the charging it to plaintiffs. Indeed, there are no facts alleged showing any connection between the audit and ACS.

4.      Fraud and deceit

In the fourth cause of action for fraud and deceit, plaintiffs assert three "counts" – a claim by MHP-USA against Martin and Obopay, alleging fraudulent inducement in connection with March 2012 Agent Agreement; a claim by MHP-USA against Realini, Robinson, and Martin, alleging fraudulent inducement in connection with March 2013 transfer of $4 million in customer funds; and a claim by "plaintiffs" against Robinson and ACS, in connection with May 2013 invoice for $25,000 for "audit" expense which they claim was really a charge for private investigator.

Defendants argue that the FAC fails to state a cause of action for fraud and deceit. Under California law, the elements of a claim of fraud are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage. Lazar v. Sup. Court, 12 Cal. 4th 631, 638 (1996). Fraud in the inducement is a subset of fraud, occurring when "the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which by reason of the fraud, is voidable." Hinesley v. Oakshade Town Ctr., 135 Cal. App. 4th 289, 294-95 (2005) (citations omitted). In addition, as noted above, Rule 9(b) requires that a party alleging fraud in federal court "state with particularity the circumstances constituting fraud or mistake."

Here, plaintiffs appear to be also alleging concealment or failure to disclose. The elements of a claim for fraudulent concealment require the plaintiff to show that (1) the defendant concealed or suppressed a material fact, (2) the defendant was under a duty to disclose the fact to the plaintiff, (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage. See Marketing West, Inc. v. Sanyo Fisher (USA) Corp., 6 Cal. App. 4th 603, 612-613 (1992).

The duty to disclose may be established where there is a confidential relationship between the parties, defendant has made a representation which was likely to mislead due to the nondisclosure, there is active concealment of undisclosed matters, or one party has sole knowledge of or access to material facts and knows such facts are not known to or discoverable by the other party. Goodman v. Kennedy, 18 Cal. 3d 335, 346-347 (1076); see also Linear Tech. Corp. v. Applied Materials, Inc., 152 Cal. App. 4th 115, 132 (2007).

a.      First "count"

In the first "count," plaintiffs allege that Martin and Obopay fraudulently induced

32

MHP-USA into entering into the Agent Agreement by representing that Obopay had compliance expertise and could provide regulatory compliance solutions for plaintiffs' U.S. operations, and that the New York and California MTLs were "pending and imminent."

Defendants argue that this "count" fails to state a claim because by the time the Agent Agreement was signed, plaintiffs had seen a list of every state in which Obopay was licensed (and that list of states was incorporated into the Agreement). Thus, defendants assert, MHP-USA knew that Obopay was not licensed in every state, and cannot reasonably claim to have relied on the statements by Martin and Obopay. Similarly, they argue, the allegation that Martin failed to disclose that Obopay had abandoned MTLs fails to state a claim because MHP-USA had, as part of signing the Agent Agreement, full knowledge of where Obopay was licensed.

Furthermore, defendants contend, the alleged misleading statements are not actionable statements of existing fact, but rather each is a subjective statement of opinion which cannot be proven false – e.g., the statement that Obopay "could provide a regulatory compliance solution."

In opposition, plaintiffs assert that the FAC adequately pleads that Martin and Obopay fraudulently induced MHP-USA to enter into the Agent Agreement in 2012. In response to defendants' argument that plaintiffs' reliance was unreasonable, plaintiffs point to FAC ¶ 106, where they allege, "When plaintiffs learned that Obopay lacked current MTLs for New York and California, just prior to the execution of the Agent Agreement, Martin misrepresented that those MTLs were pending and imminent, that it was just a matter of waiting on final approvals, and that MHP-USA could proceed with money transmissions in those states in the meantime." They also point to FAC ¶ 107, where they allege that "Martin knew but failed to disclose that Obopay had effectively abandoned all its MTLs by declining to obtain a 2011 annual audit, Obopay had abandoned its New York and California MTL applications in particular, or that Obopay's U.S. MTLs were dormant because it had stopped supporting them."

1    In response to defendants' argument that the challenged statements were merely

2    statements of opinion, plaintiffs contend that the FAC plainly alleges numerous

3    misrepresentations of fact.  For example, they assert, the representation that Obopay

4    was a "fully licensed money transmitter," see FAC ¶ 17, and the representation that

5    certain MTL approvals were "pending or imminent," see FAC ¶ 19-20, are both

6    statements of fact.  Further, they assert the FAC adequately pleads facts that

7    demonstrate a course of conduct and misrepresentations that were designed to mislead.

8    Plaintiffs contend that defendants' "merely opinion" argument fails under these

9    circumstances for the further reason that Martin and Obopay claimed to have the MTL

10   compliance expertise, see FAC ¶ 14, and thus cannot escape liability by claiming that the

11   representations were merely opinions.

12   The motion to dismiss the first "count" is DENIED. The court finds that this claim

13   raises factual issues that are not appropriate for decision on a Rule 12(b)(6) motion,

14   although the court does agree with defendants that any claim based on reporting to law

15   enforcement would be barred by the litigation privilege.

16   b.    Second "count"

17   In the second "count," plaintiffs allege that Realini, Robinson, and Martin

18   fraudulently induced plaintiffs to transfer $4 million to Obopay by representing that "the

19   existing Obopay agency program was not noncompliant," and that Obopay "needed

20   custody and control of an amount equal to the U.S. client fund in the Obopay/Payza

21   customer accounts for MTL compliance purposes," and that "this issue could be resolved

22   through the transfer of the fund and provision of daily customer balance reports to

23   Obopay." See FAC ¶ 112-113.

24   Defendants assert that this claim must be dismissed because MHP-USA does not

25   specify which defendant made the allegedly false statements, and does not even allege

26   that the statements were false.  Defendants also contend that the allegation that they

27   failed to disclose that they had initiated "hostile action" against plaintiffs (i.e., the report to

28   DHS), FAC ¶ 114, is not chronologically plausible, because the meeting at which the

34

alleged non-disclosure took place occurred on March 23, 2013, and they did not retain Deloitte to conduct the "Due Diligence" audit until May 2013.

Defendants argue further that plaintiffs have alleged no facts showing a duty to disclose; that imposing a duty on corporate officers to disclose to the actor suspected of acting illegally that the illegal conduct was being reported to law enforcement would be contrary to public policy; and that this claim is based on a protected activity (a report to law enforcement). Thus, defendants assert, because plaintiffs have not alleged (and cannot allege) that defendants owed a duty to plaintiffs to disclose that plaintiffs' illegal activity had been reported to law enforcement, the cause of action for fraud based on nondisclosure must be dismissed.

In opposition, plaintiffs assert that the FAC states a claim against Realini, Martin, and Robinson for fraudulently inducing MHP-USA to transfer $4 million to Obopay, pointing to the allegations that defendants represented to Firoz Patel and Ferhan Patel "that they had made the determination that existing Obopay agency program was non-compliant; that Obopay needed custody and control of an amount equal to U.S. client fund in Obopay/Payza customer accounts for MTL compliance purposes; but that this issue could be resolved through MHP-USA's transfer of the fund and provision of daily customer balance reports to Obopay." See FAC ¶ 113.

In response to defendants' argument that the pleading is defective because it fails to specify which defendant said what, plaintiffs contend that the FAC explains that this was a telephonic committee meeting, on March 28, 2013, where all three of the individual defendants collectively joined in the discussion and representations regarding why MHP-USA needed to transfer the money to Obopay, see FAC ¶ 52, 113; and that as a result, plaintiffs transferred the $4 million 13 days later, see FAC ¶ 54. Plaintiffs claim that these allegations satisfy Rule 9(b) because they are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged.

In response to defendants' argument that it is implausible that they had already determined by March 28, 2017, when the meeting occurred, that they were going to

1    report MHP-USA to law enforcement and cancel the 2013 Transaction, plaintiffs assert

2    that the relevant question is not when the reporting occurred, but whether the defendants

3    sincerely believed at the time that the $4 million transfer would cure the regulatory issues.

4    In plaintiffs' view, the circumstances strongly suggest that they had no such belief.

5        The motion to dismiss the second "count" is DENIED.  The court finds that these

6    claims raise factual issues are not appropriate for decision on a Rule 12(b)(6) motion,

7    although the court does agree with defendants that any claim based on reporting to law

8    enforcement would be barred by the litigation privilege.

9            c.     Third "count"

10       In the third "count," which is asserted against Robinson and ACS, plaintiffs allege

11   they were defrauded by Robinson when he sent them the invoice that included the

12   $25,000 charge for "Deloitte Financial Advisory Services LLP – Professional Services –

13   Audit Matters," which they claim Robinson falsely represented as an "auditing expense."

14   FAC ¶¶ 116, 118.  They allege that Robinson caused Obopay to transmit the invoice to

15   "plaintiffs" in connection with the purported ACS Agreement, and fraudulently induced

16   MHP-USA to pay the invoice.  Id.  They claim that ACS is liable under a theory of

17   respondeat superior because Robinson was ACS's agent acting within the scope of

18   agency under the purported ACS Agreement.  FAC ¶ 120

19       Defendants argue that this "count" must be dismissed because plaintiffs have not

20   alleged any misrepresentation of fact.  They assert that it is apparent from the FAC that

21   the statement was not false, as Deloitte was retained for auditing purposes.  They

22   contend that while plaintiffs may not have liked that they were the target of the audit, this

23   does not change the fact that Robinson's statement that the charge was for "auditing

24   expenses" was not false.

25       ACS also argues separately that this claim should be dismissed because it is not

26   pled in accordance with Rule 9(b), which applies to an agency relationship where the

27   fraud claim is based on an agency theory.  Here, ACS asserts, the FAC alleges no facts

28   showing that Robinson holds power to alter the legal relationship between ACS and third

36

United States District Court
Northern District of California

1    persons, or between ACS and Robinson; that Robinson is a fiduciary with respect to

2    matters within the scope of the agency; or that ACS has the right to control the conduct of

3    Robinson with respect to matters entrusted to him.  ACS asserts that plaintiffs simply

4    allege in a conclusory fashion that Robinson was acting as an agent of ACS and that

5    Robinson was ACS's only "employee."  See FAC ¶¶ 31, 120.  Moreover, plaintiffs

6    contend, the contents of the purported ACS Agreement suggest that if at all, Robinson

7    would have been acting as Obopay's agent, not ACS's agent, because Robinson had

8    allegedly agreed to act as president and board compliance member of Obopay.  See

9    FAC Exh. H, ¶¶ 1-2.

10        ACS contends that this claim should be dismissed for the further reason that it is

11   not really a claim of affirmative misrepresentation, but rather a claim of failure to disclose

12   the alleged full scope of the auditing services provided by Deloitte.  See FAC ¶¶ 116-118.

13   ACS argues that there was no fiduciary relationship between itself and plaintiffs, and

14   there can thus be no fraud claim based on any alleged failure to disclose to plaintiffs

15   (through Robinson) that Deloitte was retained to further investigate plaintiffs' suspected

16   illegal activity.

17        Finally, ACS asserts, although plaintiffs allege that the Deloitte charges related to

18   "the private investigation firm that defendants had engaged to pursue allegations of

19   unlawful activity against plaintiffs[,]" they don't actually plead with particularity how

20   Robinson's statement that the $25,000 charge was related to "auditing expenses" was

21   intentionally false.

22        In opposition, plaintiffs assert that the FAC adequately states a claim against

23   Robinson and ACS for fraudulently inducing MHP-USA to pay $25,000 to Obopay.

24   Plaintiffs point to FAC ¶ 117, where they allege that Ferhan Patel questioned Robinson in

25   an email about the $25,000 charge, and that "when pressed," Robinson "stated that the

26   charge was for an Obopay auditing expense that plaintiffs had agreed to pay under the

27   ACS Agreement."  As for defendants' remaining arguments – that Robinson's

28   representation was not false; that the private investigation should be considered an audit

37

1 charge as a matter of law; and that neither Robinson nor ACS had any duty to disclose its

2 true nature or purpose – plaintiffs simply dismiss them as "meritless."

3       Plaintiffs also argue that the pleading of the fraud claim(s) easily satisfies Rule

4 9(b) because it identifies the date, participants, and contents of the communications

5 involved, which are all in writing; and, they contend, the exact invoice and email chain at

6 issue are well known to all parties because they were exhibits to the motion for security

7 bond and discussed in that briefing.

8       The motion to dismiss the third "count" is GRANTED.  The claim is dismissed

9 because it is not pled in accordance with Rule 9(b) with respect to Robinson's alleged

10 agency with ACS, because the FAC does not allege facts showing that ACS owed

11 plaintiffs a fiduciary duty as required to state a fraud claim based on nondisclosure under

12 the circumstances alleged, and because the FAC does not plead particularized facts

13 showing how the statements allegedly made by Robinson regarding the $25,000 charge

14 by Obopay were intentionally false.

15       Similarly, plaintiffs have not stated a claim against Robinson, because they have

16 not alleged facts showing that the reference to an "auditing" expense was intentionally

17 false, and indeed, it is apparent from the FAC that Deloitte had been retained for auditing

18 purposes.  The Deloitte report, a copy of which was attached as Exhibit A to Robinson's

19 Declaration (Doc. 52) in support of defendants' September 21, 2016 motion for a bond,

20 was in fact presented as a "Due Diligence Report" setting forth the results of public record

21 background research.  And while plaintiffs appear to be arguing in their opposition that

22 Robinson had a duty to disclose the precise subject matter of the audit prior to the time it

23 was completed, the FAC does not in fact allege facts supporting such a duty.

24 **CONCLUSION**

25       In accordance with the foregoing, the court GRANTS ACS's motion to dismiss,

26 and GRANTS the motion to dismiss of Realini, Martin, Robinson, and Obopay in part and

27 DENIES it in part.

28       1.     The motion to dismiss the claims of quasi-contract and constructive fraud

asserted against Realini and Obopay is GRANTED. The dismissal is with prejudice.

2.     The motion to dismiss the claim of breach of the Stock Agreement asserted against Realini and Obopay, the claim of breach of the purported ACS Agreement against ACS, and the claims of breach of the implied covenant in connection with those Agreements is GRANTED. The dismissal is with prejudice.

3.      The motion to dismiss the claim of breach of the Option Agreement asserted against Realini and Obopay, and the claim of breach of the implied covenant in connection with that Agreement is DENIED.

4.     The motion to dismiss the claims of breach of fiduciary duty asserted against all defendants is GRANTED. The dismissal is with prejudice.

5.     The motion to dismiss the first and second "counts" of the claim of fraud and deceit asserted against the individual defendants and Obopay is DENIED.

6     The motion to dismiss the third "count" of the claim of fraud and deceit asserted against Robinson and ACS is GRANTED. The dismissal is with prejudice.

7.     All claims against ACS have been dismissed, with prejudice. However because ACS's request for costs has not been briefed and is not supported by documentation, the court DEFERS ruling on this part of ACS's motion until the other issues remaining in the case have been resolved.

**IT IS SO ORDERED.**

Dated: September 14, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge